Linda M. GREEN, Plaintiff-Respondent,

v.

SMITH & NEPHEW AHP, INC., a/k/a Smith & Nephew Perry, Defendant-Appellant.†

Court of Appeals

*No. 98–2162. Oral argument July 7, 2000.—Decided August 1, 2000.*

## 2000 WI App 192

(Also reported in 617 N.W.2d 881.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Constantine L. Trela, Jr.* and *Hille R. Sheppard* of *Sidley & Austin* of Chicago, Illinois; and *Donald R. Peterson* and *Sherry A. Knutson* of *Peterson, Johnson & Murray, S.C.*, of Milwaukee. There was oral argument by *Donald R. Peterson*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Robert L. Habush, Mark S. Young, Virginia M. Antoine,* and *Stefanie A. O'Shea* of *Habush, Habush, Davis & Rottier, S.C.*, of Milwaukee. There was oral argument by *Robert L. Habush*.

Before Fine, Schudson and Curley, JJ.

¶ 1. FINE, J. Smith & Nephew AHP, Inc., appeals from a judgment entered on a jury verdict against it on the products-liability claim of Linda M. Green. Green claimed, and the jury found, that latex gloves manufactured by Smith & Nephew were defective and unreasonably dangerous, and were a cause of damages she suffered as a result of her allergic reaction to them. In light of evidence that a connection between latex gloves and the type of allergic reaction suffered by

Green was essentially not known when Smith & Nephew made the latex gloves that she used, Green did not argue before the trial court, and does not contend on appeal, that Smith & Nephew was under any duty to warn of a possible allergic reaction. Thus, this is a straight defective/unreasonably-dangerous case, not a failure-to-warn case.

## I.

¶ 2. Green is allergic to proteins in natural latex, a sensitivity that was triggered by her exposure to the proteins in Smith & Nephew's gloves, which were made from natural latex. Natural latex comes from rubber trees. She used the Smith & Nephew latex gloves during her employment as a radiology technologist and computerized tomography technologist at St. Joseph's Hospital. She was first diagnosed with what her amended complaint characterizes as "latex hypersensitivity" in April of 1991.

¶ 3. Green claimed that Smith & Nephew's latex gloves were defective and unreasonably dangerous because they had a higher protein content than latex gloves made by most other manufacturers, and because the cornstarch powder, which lined the inside of the gloves and made them easier to put on and take off than they would be without the powder, caused the proteins in the latex gloves to be more likely inhaled than latex proteins in powderless gloves. Green conceded that all of the proteins in the Smith & Nephew gloves came from the raw, rubber-tree latex, and that no proteins were added by Smith & Nephew's manufacturing process. She argued, however, that Smith & Nephew should have made the gloves using a process that would have reduced their protein content. She also

contended that Smith & Nephew should not have used powder in its gloves.

¶ 4. Green presented to the jury evidence that although not common, latex-allergy among health-care workers is also not rare.[1] Thus, one of Green's experts opined that between five and seventeen percent of health-care workers have a sensitivity to latex. Another of her experts gave the figure at between six and twelve percent. Still another of Green's experts testified that between seven and ten percent of health-care workers were allergic to latex. We accept these estimates for our analysis because, as noted below, we must look at the evidence in a light most favorable to upholding the jury's verdict.

¶ 5. Smith & Nephew asserts that it is entitled to either a dismissal of Green's action or a new trial. Smith & Nephew gives five reasons supporting its request that we reverse: 1) that, as a matter of law, it is not liable to Green for what it characterizes as her "idiosyncratic" response to latex; 2) that the trial court gave the jury an erroneous instruction; 3) that the trial court erroneously permitted two of Green's witnesses to give expert opinions about whether the latex gloves were safe; 4) that the trial court should not have let the jury learn that the company to which Smith & Nephew sold its glove-manufacturing operation reduced the protein levels in the gloves; 5) that the jury's award of $584,000 for past and future pain, suffering, and disability was too much. For the reasons discussed below, we affirm.

---

[1] Latex allergy among the general population is rare. We agree with Green, however, that the target group of "users or consumers" as expressed in § 402A of RESTATEMENT (SECOND) OF TORTS are those persons who either use or consume the product, not persons who either never use the product or use it rarely.

## II.

### A. *Strict Liability*.

¶ 6. Whether Smith & Nephew is liable to Green for the injuries she suffered by using Smith & Nephew's latex gloves turns on Wisconsin's adoption of section 402A of the American Law Institute's RESTATE-MENT (SECOND) OF TORTS (1965), which charted the contours of strict-liability in tort. *See Dippel v. Sciano*, 37 Wis. 2d 443, 459, 155 N.W.2d 55, 63 (1967) (adopting § 402A). We evaluate the applicable legal principles against the facts of this case that are of record, giving to Green the benefit of all reasonable inferences that the jury could have drawn in returning its verdict in her favor. *See Morden v. Continental AG*, 2000 WI 51, ¶¶ 38–39, 235 Wis. 2d 325, 351–52, 611 N.W.2d 659, 672 (jury verdict sustained on appeal if there is any credible evidence to support it). Our legal analysis is, however, *de novo. See Sunnyslope Grading, Inc. v. Miller, Bradford and Risberg, Inc.*, 148 Wis. 2d 910, 915, 437 N.W.2d 213, 215 (1989) (whether Wisconsin law permits recovery under certain facts is a question of law). We conclude that under Wisconsin law a manufacturer is liable to a person who suffers an adverse allergic reaction to a product because of a defect that is unreasonably dangerous to a not-insignificant percentage of the population using the product, even though that product may not be dangerous to a majority of its users or consumers.

¶ 7. With exceptions not material here, under Wisconsin law " '[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for

physical harm thereby caused to the ultimate user or consumer, or to his property.' " *Dippel*, 37 Wis. 2d at 459, 155 N.W.2d at 63 (quoting § 402A(1)). This is true even though the manufacturer " 'has exercised all possible care in the preparation and sale of his product.' " *Ibid.* It is also true that "[a] product may be defective and unreasonably dangerous even though there are no alternative, safer designs available." *Sumnicht v. Toyota Motor Sales, Inc.*, 121 Wis. 2d 338, 371, 360 N.W.2d 2, 17 (1984). Additionally, a jury may, under circumstances that are not at issue here, infer from the fact of damage or injury that a product was defective. *See Jagmin v. Simonds Abrasive Co.*, 61 Wis. 2d 60, 73–74, 211 N.W.2d 810, 817 (1973). This all, however, "does not make the manufacturer or seller an insurer nor does it impose absolute liability." *Dippel*, 37 Wis. 2d at 459–460, 459 N.W.2d at 63; *see also Powers v. Hunt-Wesson Foods, Inc.*, 64 Wis. 2d 532, 536, 219 N.W.2d 393, 395 (1974). Thus, in the context of this case, it is generally recognized that a manufacturer or seller is not strictly liable under § 402A to "a consumer who suffers an allergic reaction to a product without any identifiable defect." *Adelman-Tremblay v. Jewel Cos.*, 859 F.2d 517, 522 (7th Cir. 1988) (consumer may not recover in strict liability for injuries she suffered following her idiosyncratic allergic reaction to glue in an artificial-nail kit); *see also Mountain v. Procter & Gamble Co.*, 312 F. Supp. 534, 536 (E.D. Wis. 1970) (product must be unreasonably dangerous to the "ordinary consumer") (allergic reaction to shampoo). Green does not dispute this general principle, but, as noted, contends that Smith & Nephew's latex gloves *were* defective because they had more proteins than they would have had if Smith & Nephew had made them in a different way, and also because they were powdered.

Thus, whether Smith & Nephew is liable to Green under strict-liability in tort turns on whether its latex gloves were "defective" and "unreasonably dangerous" within the meaning of § 402A and *Dippel* if they cause harm to some, but not all, consumers when used as intended.

¶ 8. There are no Wisconsin decisions discussing liability under § 402A where, as here, the plaintiff's allergic-response injuries are both: 1) not universal or nearly universal to the general population of consumers or users, and 2) not essentially unique to the plaintiff. There are, however, several decisions from other jurisdictions. The one closest in point is *Ray v. Upjohn Company*, 851 S.W.2d 646 (Mo. Ct. App. 1993).[2] In *Ray*, the plaintiff worked in a factory that

---

[2] There are other decisions in product-defect cases involving reactions that affect adversely some but not all consumers, but they do not discuss the precise issue presented here, namely whether such non-pandemic allergic reactions can support a finding that the product is defective and unreasonably dangerous as those terms are used in § 402A of the RESTATEMENT (SECOND) OF TORTS. *See, e.g., West v. Johnson & Johnson Prods., Inc.*, 174 Cal. App. 3d 831 (Cal. Ct. App. 1985) (tampon caused toxic-shock syndrome); *Adkins v. GAF Corp.*, 706 F. Supp. 559, 561–562, 564 (S.D. Ohio 1988) (exposure to asbestos can cause asbestosis, but "[n]ot every exposure" does so; "incidence of asbestosis associated with asbestos exposure depends on many different factors, including the intensity of exposure, length of exposure, individual characteristics of the exposed individual, and other factors"; asbestos sold by asbestos-mining company "was in a defective condition and unreasonably dangerous in that it was more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner"), *aff'd in part, rev'd in part, cause remanded*, 923 F.2d 1225 (6th Cir. 1991); *Simeon v. Doe*, 618 So. 2d 848, 849–851 (La. 1993) (no liability to consumer injured by adverse reaction

used a chemical that gave him asthma. *See id.*, 851 S.W.2d at 648, 651. Although "tolerable for most people," exposure to the chemical "is dangerous" to those who are sensitized to it. *Id.*, 851 S.W.2d at 650. Only five percent of persons exposed to the chemical "will acquire permanent asthma." *Id.*, 851 S.W.2d at 655. Without any analysis beyond the conclusion, *Ray* nevertheless held that there was thus sufficient evidence from which the jury could find that the chemical was defective and unreasonably dangerous. *Ibid.* Although *Ray* provides company for Green's argument, we must turn to Wisconsin law for a governing rationale to determine whether, in Wisconsin, a product can be defective if it adversely affects some but not all users.

¶ 9. The essential rationale behind § 402A was expressed in Comment *c*:

> On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market

to bacteria-containing oysters; bacteria toxic only to those with "chronic underlying liver and kidney diseases and other conditions causing, or capable of causing, impaired immune responses": "the 'defect' is really found in the person rather than the product, much in the same way that sugar is harmful only when used by someone with diabetes") (applying principle similar to that underlying § 402A of RESTATEMENT (SECOND) OF TORTS).

them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

RESTATEMENT (SECOND) OF TORTS § 402A cmt. *c* (1965). Although *Dippel* did not adopt the comments to § 402A as substantive law in this state, it did note that the comments "can be helpful in construing the rule when applying it to an individual factual situation." *Dippel*, 37 Wis. 2d at 459, 155 N.W.2d at 63. Significantly, *Dippel's* rationale for adopting strict-liability in tort for Wisconsin essentially mirrors Comment *c*. *Dippel* explained that the movement from the common law's requirement that there be privity of contract between a seller and a consumer before the consumer could recover for injuries suffered because of the seller's product, was predicated on a desire to spread the risk of injury in an increasingly complex and dangerous commercial and industrial society:

> Without belaboring its development it can now be said that the majority of the jurisdictions of the United States no longer adhere to the concept of no liability without privity of contract. The reason, which has been reiterated most often, is that the seller is in the paramount position to distribute the costs of the risks created by the defective product he is selling. He may pass the cost on to the consumer via increased prices. He may protect himself either by purchasing insurance or by a form of self-insurance. In justification of making the seller pay for the risk, it is argued that the consumer or user has the right to rely on the apparent safety of the product and that it is the seller in the first instance who

creates the risk by placing the defective product on the market.

*Id.*, 37 Wis. 2d at 450–451, 155 N.W.2d at 58 (footnote omitted). The product that causes injury, of course, must be "defective" before the risk may be spread and liability imposed; to impose liability for a non-defective product—a product that causes injury only because of the idiosyncratic response of a particular plaintiff—would be to impose "absolute," not "strict," liability. This, as we have already seen, we may not do. *See id.*, 37 Wis. 2d at 460, 459 N.W.2d at 63.

¶ 10. It can be said loosely that any product that hurts a person is "defective" insofar as that person is concerned. But, as noted, this is not the test under § 402A and *Dippel*. *See Adelman-Tremblay*, 859 F.2d at 522. There must be something more, as explained by § 402A, cmt. *i*, which was adopted by *Vincer v. Esther Williams All-Aluminum Swimming Pool Co.*, 69 Wis. 2d 326, 330–331, 230 N.W.2d 794, 797–798 (1975) (*see Kozlowski v. John E. Smith's Sons Co.*, 87 Wis. 2d 882, 893, 275 N.W.2d 915, 920 (1979), characterizing *Vincer*'s reference to comment *i* as the comment's adoption). Comment *i* explains:

> The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. *The article sold must be dangerous to an extent beyond that which would be contemplated by*

> *the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.* Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fusel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.

(Emphasis added.) This comment teaches us two things.

¶ 11. First, a product is "defective" if it is flawed beyond the contemplation of the ordinary consumer of that product. *See Sumnicht*, 121 Wis. 2d at 367–368, 360 N.W.2d at 15 ("Wisconsin is committed to the consumer-contemplation test for determining whether a product is defective."). Thus, conversely, " '[a] product is not in a defective condition when it is safe for normal handling and consumption.' " *Id.*, 121 Wis. 2d at 368, 360 N.W.2d at 15 (quoting RESTATEMENT (SECOND) OF TORTS § 402A cmt. *g*). Second, a product is "unreasonably dangerous" if the danger is not apparent to the ordinary consumer of that product. *See id.*, 121 Wis. 2d at 368–370, 360 N.W.2d at 15–16. As summarized by *Sumnicht*:

> "Thus, the test in Wisconsin of whether a product contains an unreasonably dangerous defect

depends upon the reasonable expectations of the ordinary consumer concerning the characteristics of this type of product. If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, it would not be unreasonably dangerous and defective. This is an objective test and is not dependent upon the knowledge of the particular injured consumer, although his knowledge may be evidence of contributory negligence under the circumstances."

*Id.*, 121 Wis. 2d at 370, 360 N.W.2d at 16 (quoting *Vincer*, 69 Wis. 2d at 332, 230 N.W.2d at 798).

¶ 12. Applying the principles of Wisconsin's strict-liability law to the facts of this case (giving to Green the benefit of all inferences in favor of the jury's verdict, which, as noted, we must), and bearing in mind that whether a product is defective so as to be unreasonably dangerous must be assessed on a "case-by-case basis," *see Sumnicht*, 121 Wis. 2d at 368, 360 N.W.2d at 15, it is evident that when Green used Smith & Nephew's latex gloves no "ordinary consumer" of latex gloves contemplated that they or the proteins they contained would trigger and cause the reactions Green suffered. Green has thus proven that the gloves are "defective." Additionally, we perceive no need that the "danger," if "unreasonable" (that is, if a peril is not "contemplated by the ordinary consumer"), be equally dangerous to *every* consumer, as long as the "danger" is not purely idiosyncratic to the injured plaintiff. Green has passed this hurdle as well.

¶ 13. Green introduced evidence that Smith & Nephew's latex gloves could be dangerous to between five- and seventeen-percent of health-care workers using latex gloves; according to a physician specializing

in immunology and allergy called by Green, those health-care workers "show evidence of sensitization to natural rubber latex." Another of Green's witnesses, Gordon Sussman, M.D., who practices internal medicine with a specialty in allergy and clinical immunology, testified that he has 215 patients who are allergic to latex, 74% of whom were health-care workers who suffered their allergic reactions because of latex gloves. Additionally, one of Smith & Nephew's witnesses, a professor of medicine at the UCLA School of Medicine and a specialist in immunology and allergy, agreed that "latex allergy is an occupational hazard of nursing," and that "registered nurses are potentially at high risk for latex allergy because of their occupational exposure to latex." Nurses and other health-care workers who use latex gloves on their jobs are, of course, target consumers for those gloves. Dr. Sussman also told the jury that although Green was not "susceptible or predisposed" to latex allergy, "exposing her immune system to high allergen/high protein gloves caused her latex allergy," that is, triggered it, and that he believed that "the likelihood of that happening if she was [sic] exposed to less allergen, low allergen/low protein powder-free gloves is very remote."

¶ 14. We agree with the trial court that the jury could have reasonably concluded that Smith & Nephew's latex gloves were defective and unreasonably dangerous, within the meaning of § 402A and *Dippel*. This comports with the rationale behind *Dippel*'s adoption of strict-liability in order to spread the risk of injury from its former focus on the particular

person hurt to society as a whole. *See Dippel*, 37 Wis. 2d at 450–451, 155 N.W.2d at 58.[3]

## B. *Jury Instruction*

¶ 15. Smith & Nephew claims that the trial court erroneously instructed the jury. A "trial court has wide discretion in choosing the language of jury instructions and if the instructions given adequately explain the law applicable to the facts, that is sufficient and there

---

[3] During World War II, German bombers salted England with haphazard, indiscriminate destruction. Although the bombs were potentially dangerous to all, they only destroyed homes and businesses upon or near which they landed. This was essentially a random twirl of the wheel. Winston S. Churchill, then the British prime minister, recognized that it was unfair for British society to place the entire burden of the destruction on those unlucky enough to be hit: He wrote of his solution:

> Another time I visited Margate. An air raid came upon us, and I was conducted into their big tunnel, where quite large numbers of people lived permanently. When we came out, after a quarter of an hour, we looked at the still-smoking damage. A small restaurant had been hit. Nobody had been hurt, but the place had been reduced into a litter of crockery, utensils, and splintered furniture. The proprietor, his wife, and the cooks and waitresses were in tears. Where was their home? Where was their livelihood? Here is a privilege of power. I formed an immediate resolve. On the way back in my train I dictated a letter to the Chancellor of the Exchequer laying down the principle that all damage from the fire of the enemy must be a charge upon the State and compensation be paid in full and at once. Thus the burden would not fall alone on those whose homes or business premises were hit, but would be borne evenly on the shoulders of the nation.

WINSTON S. CHURCHILL, THEIR FINEST HOUR 349 (1949). In essence that is what § 402A and *Dippel* have done with respect to those who suffer randomly from the imperfections inherent in a complex and dangerous society that, although it brings many benefits to all, also inflicts harm on some.

is no error in the trial court's refusal to use the specific language requested by the defendant." *State v. Herriges*, 155 Wis. 2d 297, 300, 455 N.W.2d 635, 637 (Ct. App. 1990). Further, a trial court's instructions to the jury must be read as a whole: "If the overall meaning is a correct statement of the law, then any erroneous part of the instruction is harmless and not grounds for reversal." *State v. Petrone*, 161 Wis. 2d 530, 561, 468 N.W.2d 676, 688 (1991), *cert. denied*, 502 U.S. 925. It is against this background that we assess Smith & Nephew's claim of trial-court error.

¶ 16. Smith & Nephew argues that the trial court erred in modifying the pattern jury instruction found in WIS JI—CIVIL 3260 (1999) from: A product is defective if it is "not reasonably fit for the ordinary purposes for which such product was sold and intended to be used" to: "A product is said to be defective when it is in a condition not contemplated by the ordinary user or consumer which is unreasonably dangerous to the ordinary user or consumer." The trial court's instruction was, however, an accurate statement of Wisconsin law, and is essentially a clone of Comment *g* to § 402A, which was adopted by *Vincer. See Sumnicht*, 121 Wis. 2d at 368, 360 N.W.2d at 15. Comment *g* explains:

> " '*Defective condition*. The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.' "

*Ibid.* (quoting § 402A cmt. *g*). Moreover, Smith & Nephew's related complaint that the trial court erroneously adopted the consumer-contemplation test is also without merit. *See Sumnicht*, 121 Wis. 2d at 368, 360

N.W.2d at 15 ("Wisconsin is committed to the consumer-contemplation test for determining whether a product is defective.").

¶ 17. Smith & Nephew also claims in its appellate brief that the trial court "improperly instructed the jury that [Smith & Nephew] could be held liable even if it did not know and 'could [not] have known' of the risk allegedly presented by its gloves." (First bracketing by us; second bracketing by Smith & Nephew.) Smith & Nephew's claim is without merit. First, as we have already seen, a manufacturer is liable for a defective product that is unreasonably dangerous even though it " 'has exercised all possible care in the preparation and sale of his product.' " *Dippel*, 37 Wis. 2d at 459, 155 N.W.2d at 63 (quoting § 402A(1)). Second, "[t]he liability imposed is not grounded upon a failure to exercise ordinary care with its necessary element of foreseeability." *Id.*, 37 Wis. 2d at 461, 155 N.W.2d at 64; *Glassey v. Continental Ins. Co.*, 176 Wis. 2d 587, 604, 500 N.W.2d 295, 303 (1993) ("Foreseeability is not an element considered in strict products liability claims."). The trial court did not err in instructing the jury.

C. *Expert Testimony.*

¶ 18. Smith & Nephew claims that the trial court erred in permitting the jury to hear the opinions of two witnesses called by Green: Paul Cacioli, Ph.D., and Gordon Sussman, M.D. We discuss these contentions in turn.

1. *Paul Cacioli.*

¶ 19. Cacioli holds a Ph.D. degree as a chemist, and was employed as a Director of Research and Devel-

opment and Technical Affairs by the company that purchased Smith & Nephew's latex-glove business in 1995. He was identified to the jury by the trial court as "an expert on glove manufacturing process." The trial court read to the jury a summary of excerpts from Cacioli's deposition testimony, noting that Cacioli believed that the latex gloves manufactured by Smith & Nephew had "high" protein levels and that Cacioli "considered these levels unsafe and unacceptable." Additionally, the trial court told the jury that, "in Dr. Cacioli's opinion, a lower protein glove is a safer glove." Cacioli, however, had, in his deposition, specifically disclaimed any expertise in that area:

> We're very much in the dark about what is safe and what is unsafe. There has been no definition at this point in time to us as to what is considered to be safe, and there are conflicting opinions, as well, from knowledgeable people in this area. I can only make that statement from what I believe is unsafe, and I'm not an expert in that area, so I'd just like to clarify that.

Green argued to the trial court that Cacioli's opinion that Smith & Nephew's gloves were not safe was admissible because Cacioli helped decide how to manufacture the latex gloves with lower levels of protein than were in Smith & Nephew's gloves:

> You don't have to be a doctor to know whether a product is safe or unsafe. That is not a medical opinion. That's a manufacturing quality control opinion. You don't have to be a doctor to say safe or not safe.
> He's a manufacturing expert knowing what's going on in the field, knowing the manufacturing practice, knowing what's going on with respect to

> sensitization problems [and] can better than any-
> body talk about whether a product is safe or not.

The trial court apparently adopted this rationale, because none other appears of record.

¶ 20. " 'A trial court's decision to admit or exclude expert testimony is a discretionary determination that is made pursuant to Rule 901.04(1), Stats.' The determination, however, must have 'a reasonable basis' and be made 'in accordance with accepted legal standards and in accordance with the facts of record.' " *James v. Heintz*, 165 Wis. 2d 572, 578–579, 478 N.W.2d 31, 34 (Ct. App. 1991) (citations omitted). We believe that the trial court erred in its legal analysis of the admissibility of Cacioli's testimony that the Smith & Nephew gloves were not safe.

¶ 21. Unlike in the federal system, where the trial court has a significant "gatekeeper" function in keeping from the jury expert testimony that is not reliable, *see, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (scientific expert testimony); *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167 (1999) (expert testimony in general), the trial court's gate-keeper role in Wisconsin is extremely limited:

> The rules in regard to the admission of expert testimony are also clear. The Wisconsin Rule of Evidence, sec. 907.02, Stats., Testimony by experts, provides that, if scientific or specialized knowledge will assist the trier of fact to determine a fact in issue, a qualified expert may testify. As the commentary to Rule 907.02 points out, under Rule 907.02, expert testimony is admissible if relevant and will be excluded only if the testimony is super-fluous or a waste of time.

*State v. Walstad*, 119 Wis. 2d 483, 516, 351 N.W.2d 469, 486 (1984). Under Wisconsin law, scientific testimony is admissible if it is " 'an aid to the jury' or 'reliable enough to be probative.' " *Id.*, 119 Wis. 2d at 519, 351 N.W.2d at 487 (citation omitted). An opinion for which there is no proper foundation—for which the witness has no, in the words of WIS. STAT. RULE 907.02, "scientific, technical, or other specialized knowledge"—is not "reliable enough to be probative." Simply put, the witness must be first qualified as an expert under RULE 907.02 before he or she can give any opinion within the asserted area of expertise:

> The fundamental determination of admissibility comes at the time the witness is "qualified" as an expert. In a state such as Wisconsin, where substantially unlimited cross-examination is permitted, the underlying theory or principle on which admissibility is based can be attacked by cross-examination or by other types of impeachment.

*Walstad*, 119 Wis. 2d at 518–519, 351 N.W.2d at 487. *See also State v. Peters*, 192 Wis. 2d 674, 690, 534 N.W.2d 867, 873 (Ct. App. 1995) ("Once the relevancy of the evidence is established and the witness is qualified as an expert, the reliability of the evidence is a weight and credibility issue for the fact finder and any reliability challenges must be made through cross-examination or by other means of impeachment.").

¶ 22. There is nothing in the record here to indicate that Cacioli had any expertise to assess whether gloves with high protein levels were safe or unsafe, except from what he either read or was told by others. Indeed, as we have seen, Cacioli specifically denied that he could give an expert opinion as to whether high-

protein gloves were safe or unsafe. Certainly, if a witness can establish his or her expertise by his or her own testimony, *see James*, 165 Wis. 2d at 579, 478 N.W.2d at 34, the witness can also disavow any expertise by his or her own testimony.

¶ 23. As noted, the basis for the admission of Cacioli's opinion on the safety of Smith & Nephew's gloves was his role in deciding to lower the protein levels and eliminate the powder in the gloves made by the company that purchased Smith & Nephew's glove-making operation. This was Green's syllogism: Cacioli is an expert in the chemistry of making latex gloves, he wanted to make gloves with lower protein levels than the gloves made by Smith & Nephew because he believed gloves with lower protein levels were safer, thus he could give an expert opinion that gloves with high protein levels are less safe than gloves with low protein levels. This argument implicates WIS. STAT. RULE 907.03, which permits an expert witness to rely on inadmissible data if the data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." But this rule only permits the witness to rely on otherwise inadmissible data (here, the opinions of unknown persons who did not testify) *if* the expert witness is testifying within his or her expertise. *See Lemberger v. Koehring Co.*, 63 Wis. 2d 210, 218, 216 N.W.2d 542, 546 (1974). A simple example will illustrate this point. If Albert Einstein, an admitted expert on relativity, believes that in working out his theories on a chalk board he should use Brand X of chalk because he has heard that Brand X contains less of a potentially harmful substance than does Brand Y, Einstein's opinion about chalk safety would not be admissible in a prod-

ucts-liability lawsuit to prove that Brand Y chalk was less safe than Brand X—the safety of chalk is not within his area of expertise. As Cacioli admitted, his opinion on glove safety was outside his area of expertise. The trial court should not have received his opinion on the safety of latex gloves.

¶ 24. Although the trial court erred in receiving Cacioli's opinion about the relative safety of latex gloves, this does not end our inquiry. "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." WIS. STAT. RULE 901.03(1). This requires that we first determine whether the improperly admitted evidence was prejudicial, and, if so, we must weigh the improperly admitted evidence "against the totality of the sufficient credible evidence supporting the verdict." *Sumnicht*, 121 Wis. 2d at 377, 360 N.W.2d at 20.

¶ 25. There is little doubt but that Cacioli's testimony that his company's latex gloves were safer than those made by Smith & Nephew because of their lower levels of protein was prejudicial to Smith & Nephew; it went to the heart of Green's case, and the jury should not have heard it. But the jury also heard that opinion from other witnesses who *were* qualified to give it. As noted earlier in Part IIA of this opinion, one of Smith & Nephew's witnesses, a professor of medicine at the UCLA School of Medicine and a specialist in immunology and allergy, agreed that "latex allergy is an occupational hazard of nursing," and that "registered nurses are potentially at high risk for latex allergy because of their occupational exposure to latex." Further, the jury learned that a joint statement issued by the American Academy of Allergy, Asthma and Immunology and the American College of Allergy, Asthma

and Immunology noted that "[m]edical devices, principally latex gloves, are the largest single source of exposure" to "latex rubber proteins," which it called "potent allergens." The joint statement recommended, among other precautions, that "[o]nly low allergen latex gloves should be purchased and used," and, additionally, that "[o]nly powder-free latex gloves should be purchased and used." In light of this evidence, we cannot say that receipt of Cacioli's opinion affected adversely a "substantial right" of Smith & Nephew, especially since Smith & Nephew's attorney told the jury that Cacioli said that he was "no expert."

 2. *Gordon Sussman.*

¶ 26. Smith & Nephew also complains that the trial court should not have permitted Dr. Sussman to tell the jury that in his opinion gloves with low protein levels were safer than gloves whose protein levels were high. Smith & Nephew argues that the rational underpinnings to Dr. Sussman's opinion were either lacking or, indeed, contradicted his opinion. We need not spend too much space on this argument because, as we have noted, under Wisconsin law it is the jury's responsibility, not the trial judge's duty, to assess the reliability of an expert's opinions. Simply put, once the proponent of a witness's expert opinion establishes that the witness is, in fact, an expert under WIS. STAT. RULE 907.02, the reliability of that witness's opinions is something that the jury has to assess. *See Peters*, 192 Wis. 2d at 690, 534 N.W.2d at 873. Smith & Nephew conceded during oral argument that Dr. Sussman was testifying within the scope of his RULE 907.02 expertise, and was, during the trial, given wide latitude in its attempt to impeach Dr. Sussman's opinions.

D. *Evidence of Manufacturing Change.*

¶ 27. Smith & Nephew claims that the trial court erroneously permitted Green to tell the jury that the company to which Smith & Nephew sold its glove-making operations in 1995 had, shortly thereafter, changed the way it made the gloves so as to reduce the protein levels in the latex gloves. We disagree.

¶ 28. Evidence is generally admissible if it is "relevant." WIS. STAT. RULE 904.02. Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. RULE 904.01. The trial court held the evidence to be relevant. The trial court correctly applied the law.

¶ 29. Although, as noted earlier, a manufacturer may be held strictly liable for injuries caused by a product that is defective and unreasonably dangerous even though the manufacturer " 'has exercised all possible care in the preparation and sale of his product,' " *Dippel*, 37 Wis. 2d at 459, 155 N.W.2d at 63 (quoting § 402A(1)), and although "[a] product may be defective and unreasonably dangerous even though there are no alternative, safer designs available," *Sumnicht*, 121 Wis. 2d at 371, 360 N.W.2d at 17, evidence of a change in manufacturing process or design is, nevertheless, "admissible" in a strict-liability case because it "is not without probative value," *Chart v. General Motors Corp.*, 80 Wis. 2d 91, 100, 258 N.W.2d 680, 683 (1977). We are bound by *Chart. See State v. Lossman*, 118 Wis. 2d 526, 533, 348 N.W.2d 159, 163 (1984). Indeed, although evidence of a feasible way to eliminate or reduce a danger is not an element of a strict-liability claim, it tends to show that a manufacturer not using

such a method to eliminate or reduce a danger presented by its product has made a product that is *unreasonably* dangerous.

¶ 30. Relevant evidence may, of course, be excluded if, among other reasons, "its probative value is substantially outweighed by the danger of unfair prejudice." WIS. STAT. RULE 904.03. Smith & Nephew has not demonstrated, however, beyond its assertion that it would have preferred that the jury not learn of the change in manufacturing process, how the trial court erroneously exercised its broad discretion in concluding that evidence of what Smith & Nephew's successor did to reduce the protein levels in the latex gloves should not be excluded under WIS. STAT. RULE 904.03.

E. *Damage Award.*

¶ 31. The jury awarded one million dollars to Green. Of that award, it specified that $584,000 was for past and future pain, suffering, and disability. Smith & Nephew claims that this aspect of the award is excessive and that the trial court erred in not either ordering a remittitur or a new trial. We disagree.

¶ 32. "If there is any credible evidence which under any reasonable view supports the jury finding as to the amount of damages, especially where the verdict has the approval of the trial court, this court will not disturb the finding unless the award shocks the judicial conscience." *Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 446, 405 N.W.2d 354, 374 (Ct. App. 1987).

¶ 33. There was substantial evidence that Green suffered horrendous pain and suffering from what the jury could have reasonably concluded were injuries caused by Smith & Nephew's gloves. Her initial reac-

tions to the gloves included, as she testified, "red, cracked, sore, peeling hands at work." Then, she developed cold-like symptoms that would not only not go away but developed into serious breathing difficulties:

> I was having trouble breathing. I was getting short of breath. I started coughing and my throat started getting tight where I wasn't speaking right; and after a few seconds or a few minutes, I waited, and it was actually getting worse, where I couldn't even talk to my patient.

¶ 34. Green went home, and, when her condition did not improve, she went to a hospital emergency room, where she was given a number of medications. After five or six hours, she improved enough to go home. Her symptoms reappeared until one day at work she again could not breathe. She told the jury that she was frightened because "it happened once before, and I couldn't get my air." Again she went to the hospital, where she stayed for five days.

¶ 35. Ultimately, Green was diagnosed with asthma. Her breathing problems continued, and she was hospitalized for more tests. One of the tests, a bronchoscopy, involved the insertion of a tube into the lungs. Green told the jury what that was like:

> And when he was putting the tube down my airway, I wasn't — I was increasingly having more difficulty breathing and they inject a little bit of saline to take their samples for the lab samples, and it felt like I was drowning, and he said "This will be done soon. This will be done soon", and it just kept getting worse. I was getting less and less air, and he decided to quit.
>
> When they started to pull the scope out, he couldn't pull the tube out, and I couldn't breathe

until he pulled it out, and I made a horrifying sound trying to get my air, and then they rushed me to the Intensive Care Unit.

¶ 36. Green no longer works at the healthcare job she once held, and told the jury that as a result of her sensitization she has "to watch where I go, what I purchase, what I eat, people I'm with, things that I do." She related that she "can't eat out much or buy things that I don't know about, because I don't know that they weren't prepared with people using latex gloves." She explained: "You can walk through the mall nowadays, and the food counters at the malls, they're wearing latex gloves. They're wearing them at deli's [sic], restaurants. I can't take that chance." She wears a medical-alert bracelet and carries an epinephrine injection kit in her purse in case she gets a reaction that prevents her from breathing. She summed up for the jury her view of her future: "I don't have much choice. I have to live this way. I have to watch what I do, watch where I go, watch what I eat."

¶ 37. At the time of trial, Green had a life-expectancy of almost 50 years. We cannot say in light of all of her suffering and in light of the substantial detour that her life and her lifestyle has had to take that the jury's assessment of $584,000 for past and future pain, suffering, and disability shocks the judicial conscience.

*By the Court.*—Judgment affirmed.