# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 08-2807/08-2813/08-2894/08-2895

_____

| | | |
|---|---|---|
| Reginald Clemons; Richard D. Clay; Jeffrey R. Ferguson; Roderick Nunley, | * * * | |
| Plaintiffs, | * * * | |
| Michael Anthony Taylor; Martin Link; Mark Christeson; William L. Rousan; John Charles Middleton; Russell Earl Bucklew; Earl Ringo, Jr., | * * * * * | Appeals from the United States District Court for the Western District of Missouri. |
| Intervenor Plaintiffs/Appellants, | * * | |
| v. | * * | |
| Larry Crawford; James D. Purkett; Terry Moore, | * * * | |
| Defendants/Appellees. | * | |

_____

Submitted: February 11, 2009
Filed: November 10, 2009

_____

Before RILEY, SMITH, and SHEPHERD, Circuit Judges.

_____

RILEY, Circuit Judge.

Eight condemned Missouri prisoners[1] appeal the dismissal of their 42 U.S.C. § 1983 action challenging the manner in which Missouri's written lethal injection protocol might be implemented in future executions. The prisoners allege the State of Missouri, through its officers Larry Crawford, James Purkett, and Terry Moore (collectively, Missouri), has a "well-documented history of employing incompetent and unqualified personnel to oversee [the] crucial element[s] of executions by lethal injection," and "refusing properly to train the individuals to whom responsibility for crucial tasks in the lethal injection process is delegated." Based on this history, the prisoners argue Missouri "will continue to employ such incompetent and unfit personnel for future executions." The prisoners contend this possibility violates the Eighth Amendment by creating a substantial risk that Missouri's written execution protocol will not be followed, resulting in the condemned prisoners being insufficiently anesthetized and suffering extreme pain before their deaths.

The district court[2] initially denied Missouri's motion for judgment on the pleadings, but later reconsidered *sua sponte* and granted the motion. In the same order, the district court denied the motions to intervene of three other condemned Missouri prisoners.[3] The intervenors appeal this ruling. We affirm the district court's grant of judgment on the pleadings and its denial of the motions to intervene.

---

[1]These eight prisoners, Reginald Clemons, Richard D. Clay, Jeffrey R. Ferguson, Roderick Nunley, Michael Anthony Taylor, Martin Link, Mark Christeson, and William L. Rousan, will be collectively referred to as the "prisoners."

[2]The Honorable Fernando J. Gaitan, Chief Judge, United States District Court for the Western District of Missouri.

[3]These three prisoners, John Charles Middleton, Russell Earl Bucklew, and Earl Ringo, Jr., will be collectively referred to as the "intervenors."

-2-

## I.    BACKGROUND

### A.    Missouri's Execution Procedure Before the Written Protocol

Before establishing a written execution protocol, Missouri used an unwritten execution procedure which called for the successive administration of three chemicals through an intravenous line (IV) placed in the femoral vein.  See Taylor v. Crawford, 487 F.3d 1072, 1074 (8th Cir. 2007), cert. denied, 128 S. Ct. 2047 (2008).  First, 5 grams of sodium pentothal (also known as thiopental) rendered the prisoner unconscious, then 60 milligrams of pancuronium bromide paralyzed the prisoner's muscles, and finally, a 240-milliequivalent injection of potassium chloride stopped the prisoner's heart.  Id.

Discovery in the Taylor litigation[4] revealed Missouri employed a physician, John Doe I (Dr. Doe), to mix the lethal chemicals and insert the IV lines.  Id. at 1075.  Under Missouri's unwritten procedure, Dr. Doe believed he had "independent authority to alter the chemical doses at will based on his medical judgment, and that in fact, there were occasions when he chose to give a dose of only 2.5 grams of thiopental without notifying the director."[5]  Id.  "Dr. Doe [] revealed that he has dyslexia, which causes him to transpose letters and numbers," id., and Dr. Doe also "admitted he did not keep accurate chemical logs" documenting the amount of each chemical given at an execution, id. at 1076.  Dr. Doe monitored the prisoner's anesthetic depth solely by observing the prisoner's facial expression through a window which was partially obstructed by blinds.  Id. at 1075.  The prisoners' complaint in the instant case asserts Missouri knew Dr. Doe had "medical licensure

---

[4]The full history of the Taylor litigation is recounted in Taylor, 487 F.3d 1072, Taylor v. Crawford, 445 F.3d 1095, 1096-98 (8th Cir. 2006), and Taylor v. Crawford, 457 F.3d 902, 904 (8th Cir. 2006).

[5]A dose of 2.5 grams of thiopental would be sufficient to induce a state of deep anesthesia, and, "in fact, rapid induction of anesthesia for surgery is generally achieved in the average adult with a 0.28-gram dose."  Taylor, 487 F.3d at 1076.

problems and problematic malpractice history."[6] The prisoners also assert a licensed vocational nurse, John Doe II (Nurse Doe),"was unable to tell, despite personal observation, that [Dr. Doe] consistently prepared the wrong dose of thiopental."

During the Taylor litigation, the district court determined Missouri's unwritten method of execution subjected condemned prisoners to an unconstitutional risk of pain and suffering, and ordered the State to prepare a written protocol incorporating various provisions. See Taylor v. Crawford, No. 05-4173-CV-C-FJG, 2006 WL 1779035, *8 (W.D. Mo. June 26, 2006). Missouri established a written execution protocol and, after further litigation, this court upheld the constitutionality of Missouri's written protocol. See Taylor, 487 F.3d at 1085.

**B.     Missouri's Written Lethal Injection Protocol**

Missouri's written execution protocol requires the successive administration of the same three chemicals used under the unwritten protocol. First, a set of four syringes containing a total of 5 grams of thiopental in a 200 cc solution renders the prisoner unconscious, and is followed by a saline flush. Medical personnel then "physically examine the prisoner to confirm that he is unconscious," using "standard clinical techniques to assess consciousness, such as checking for movement, opened eyes, eyelash reflex, pupillary responses or diameters, and response to verbal commands and physical stimuli." Medical personnel then inspect the IV site. A second set of syringes containing an additional 5 grams of thiopental will be administered through a secondary IV line in the unlikely event the prisoner is still conscious after receiving the initial 5 grams. After confirming the prisoner is unconscious, 60 milligrams of pancuronium bromide in a 60 cc solution is injected, rendering the prisoner unable to move. The prisoner is then injected with another

---

[6]Despite Dr. Doe's shortcomings, we observed "there was not a scintilla of evidence that any prisoner ever suffered any pain other than what was necessary to acquire access to the prisoner's circulatory system through the insertion of the needed intravenous lines." Taylor, 487 F.3d at 1075.

saline flush. Finally, 240 milliequivalents of potassium chloride is injected to stop the prisoner's heart. After another saline flush, medical personnel monitor the electrical activity of the prisoner's heart, pronouncing death when an electrocardiogram shows all electrical activity of the prisoner's heart has ceased. If the prisoner's heart does not stop within five minutes, additional potassium chloride is injected. The proper administration of thiopental ensures the condemned prisoner will not experience any pain caused by the "potassium chloride, which indisputably will cause an excruciating burning sensation as it travels through [the condemned prisoner's] veins to induce a heart attack." Taylor, 487 F.3d at 1074.

The execution team includes medical personnel and non-medical personnel. Under the protocol, a physician, nurse, or pharmacist prepares the chemicals used at the execution. Medical personnel may not change the quantities of these chemicals without prior approval from the department director. The fifteen syringes are distinctively labeled. "Medical personnel determine the most appropriate locations for [IV] lines," and "may insert the primary IV line as a peripheral line or as a central venous line . . . provided they have appropriate training, education, and experience for that procedure." A physician, nurse, or emergency medical technician (EMT) is responsible for inserting the IV lines, inspecting the IV site, attaching the leads from the electrocardiograph to the prisoner's chest, assessing the prisoner's consciousness, monitoring the prisoner, and supervising the injection of the lethal chemicals by non-medical members of the execution team. After the execution, medical personnel are required to sign a "Chemical Log," indicating the quantities of the chemicals used and the quantities discarded during the execution. Missouri's protocol also requires all members of the execution team to sign a form verifying the chemicals were given in the order specified by the protocol. Dr. Doe is no longer a member of Missouri's execution team. Taylor, 487 F.3d at 1077 n.3.

## II.    DISCUSSION

### A.    Standard of Review

We review de novo a district court's grant of judgment on the pleadings, "view[ing] all facts pleaded by the nonmoving party as true and grant[ing] all reasonable inferences in favor of that party." Poehl v. Countrywide Home Loans, Inc., 528 F.3d 1093, 1096 (8th Cir. 2008) (citations omitted). "A grant of judgment on the pleadings is appropriate 'where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law.'" Id. (quoting Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir. 2002)).

We review the grant of judgment on the pleadings under "the same standard used to address a motion to dismiss for failure to state a claim under [Fed. R. Civ. P.] 12(b)(6)." Ashley County, Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009) (citation omitted). "[W]ell-pleaded facts, not legal theories or conclusions, determine [the] adequacy of [t]he complaint." Mattes v. ABC Plastics, Inc., 323 F.3d 695, 698 (8th Cir. 2003) (citing Parkhill v. Minn. Mut. Life Ins. Co., 286 F.3d 1051, 1057-58 (8th Cir. 2002)). The facts alleged in the complaint "'must be enough to raise a right to relief above the speculative level.'" Drobnak v. Andersen Corp., 561 F.3d 778, 783 (8th Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

### B.    Eighth Amendment

The prisoners argue Missouri's current execution protocol violates the Eighth Amendment because of the substantial risk the protocol may be improperly administered by incompetent or unqualified medical personnel. According to the prisoners' allegations, Missouri's past employment of Dr. Doe and Nurse Doe creates "a grave risk that [the prisoners] will experience unconstitutional pain and suffering" during their future executions, in violation of their Eighth and Fourteenth Amendment rights. Put another way, the prisoners argue Missouri will hire "incompetent and unfit personnel" in the future because it has allegedly done so in the past. The prisoners assert, although Missouri's written protocol is constitutional on its face, the written

-6-

protocol "will have little effect when ignored or bungled by incompetent or unfit personnel." Because we have already held Missouri's execution protocol is constitutional as written, our opinion now confines itself to the question of whether Missouri's protocol violates the Eighth Amendment because of a possibility incompetent or unqualified personnel will improperly prepare or administer the lethal chemicals required by Missouri's protocol.

"The Eighth Amendment to the Constitution, applicable to the States through the Due Process Clause of the Fourteenth Amendment, provides that '[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.'" Baze v. Rees, 553 U.S. __, 128 S. Ct. 1520, 1529 (2008) (internal citation omitted). Because capital punishment is constitutional, "[i]t necessarily follows that there must be a means of carrying it out." Id. "[T]he constitution does not demand the avoidance of all risk of pain in carrying out executions." Id. Instead, to establish an Eighth Amendment violation, "the conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" Id. at 1530-31 (quoting Helling v. McKinney, 509 U.S. 25, 33, 34 (1993)). "[T]o prevail on such a claim there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" Id. at 1531 (quoting Farmer v. Brennan, 511 U.S. 825, 842, and 846 n.9 (1994)). The mere fact "an execution method may result in pain, either by accident or as an inescapable consequence of death," does not amount to an Eighth Amendment violation. Id.

In Baze, the Supreme Court addressed the constitutionality of Kentucky's written lethal injection protocol. Id. at 1525-26. Like Missouri's protocol, Kentucky's protocol involves the successive administration of thiopental, pancuronium bromide, and potassium chloride. Id. at 1528. Kentucky's "protocol reserves responsibility for inserting the IV catheters to qualified personnel having at

least one year of professional experience." Id. Non-medical "personnel are responsible for mixing the solutions containing the three drugs and loading them into syringes." Id. The warden and deputy warden are responsible for visually inspecting the prisoner for signs of consciousness and watching for problems with the IV catheters and tubing. Id.

Like the prisoners in this case, the Baze petitioners contended there was "a significant risk that the [lethal injection] procedures [would] *not* be properly followed—in particular, that the sodium thiopental [would] not be properly administered to achieve its intended effect—resulting in severe pain when the other chemicals are administered." Id. at 1530. With respect to the risk the thiopental would be improperly prepared, the Baze petitioners contended (1) "the doses are difficult to mix into solution form and load into syringes," and (2) "Kentucky employs untrained personnel who are unqualified to calculate and mix an adequate dose[.]" Id. at 1533. The Supreme Court saw no substantial risk of serious harm in allowing non-medical personnel to mix the thiopental, recognizing the state trial court's finding that mixing thiopental is a simple process involving injecting a liquid into a vial of powder and shaking it up until the powder dissolves. See id.

The Baze petitioners also made similar arguments regarding the risk the thiopental would be improperly administered. The Baze petitioners argued it was "possible that the IV catheters [would] infiltrate into surrounding tissue, causing an inadequate dose to be delivered to the vein," and "Kentucky has no reliable means of monitoring the anesthetic depth of the prisoner after the sodium thiopental has been administered." Id. The Court rejected these arguments, declaring, "the asserted problems related to the IV lines do not establish a sufficiently substantial risk of harm to meet the requirements of the Eighth Amendment." Id.

The Court determined there was no substantial risk of serious harm because Kentucky's protocol incorporated various important safeguards to protect against

improper administration of thiopental, "[t]he most significant [safeguard being] the written protocol's requirement that members of the IV team must have at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman." Id. The Court also observed Kentucky's protocol required preparation of two sets of lethal injection drugs, and "call[ed] for the IV team to establish both primary and backup lines." Id. at 1534. The Court reasoned, "These redundant measures ensure that if an insufficient dose of sodium thiopental is initially administered through the primary line, an additional dose can be given through the backup line before the last two drugs are injected." Id. Finally, the Court recognized the additional safeguard of "the warden and deputy warden in the execution chamber . . . watch[ing] for signs of IV problems, including infiltration," which "would be very obvious even to the average person, because of the swelling that would result." Id. (internal quotation marks omitted). The Court held, "[t]he risks of maladministration [petitioners] have suggested—such as improper mixing of chemicals and improper setting of IVs by trained and experienced personnel— cannot remotely be characterized as 'objectively intolerable.'" Id. at 1537. Addressing future challenges to other states' protocols, the Court declared, "[a] State with a lethal injection protocol substantially similar to [Kentucky's] . . . would not create" a substantial risk of severe pain rising to the level of an Eighth Amendment violation. Id.

The Missouri protocol's safeguards against the risk of maladministration are similar to, and in many ways more stringent than, Kentucky's. Missouri's protocol requires a physician, nurse, or pharmacist (rather than a layperson) to prepare the thiopental. Missouri also requires medical personnel (rather than the warden or deputy warden) to watch for signs of IV problems, and to enter the execution chamber to check for signs of consciousness and examine the IV site. A physician, nurse, or EMT with appropriate training, education, and experience sets the IVs. A backup IV is set, and an additional 5 grams of thiopental is prepared in the unlikely event the prisoner is still conscious after receiving the first 5-gram dose. Medical personnel have no discretion to vary the amount of chemicals given without prior approval from

the director. As we recognized in <u>Taylor</u>, the various safeguards in Missouri's protocol, coupled with the lack of discretion allowed, minimize any risk that the chemicals will be improperly prepared or administered. See <u>Taylor</u>, 487 F.3d at 1084.

The prisoners contend their allegations are different from the allegations in <u>Baze</u>, because <u>Baze</u> addressed only the risk that *competent* medical personnel might improperly prepare or administer the lethal chemicals. The prisoners in this case emphasize that their allegations state a claim for violation of the Eighth Amendment because they have alleged previous improper preparation and administration of the lethal chemicals by *incompetent* medical personnel.[7] The Missouri prisoners here, just as the Kentucky petitioners in <u>Baze</u>, "acknowledge that the lethal injection procedure, if applied as intended, will result in a humane death," but "nevertheless contend that the lethal injection protocol is unconstitutional . . ., because of the risk that the protocol's terms might not be properly followed . . . ." <u>Baze</u>, 128 S. Ct. at 1526. We reject the prisoners' attempt to distinguish their case from <u>Baze</u> on the basis of alleged past incompetence on the part of Missouri's medical personnel.

In <u>Taylor</u>, we declared, "[a]bsent some specific disqualifying characteristic of the chosen medical personnel, we would be hard pressed to say that a physician, trained nurse, or a licensed pharmacist is not qualified to mix the chemicals." <u>Taylor</u>, 487 F.3d at 1084. The prisoners' complaint sets forth no such disqualifying characteristic.[8] Further, although the prisoners' complaint repeatedly uses conclusory

---

[7]Because the prisoners do not define the terms "competent" or "incompetent," we give the words their dictionary definitions. "Competent" is defined as "having suitable or sufficient skill, knowledge, experience, etc., for some purpose; properly qualified." <u>Random House Webster's Unabridged Dictionary</u> 417 (2d ed. 1997). "Incompetent" is defined as "not competent; lacking qualification or ability; incapable." <u>Id.</u> at 967.

[8]In their brief, the prisoners allege discovery revealed a member of the execution team, possibly Nurse Doe, has a 1998 misdemeanor criminal conviction for

-10-

terms such as "incompetent," "unfit," "untrained," and "unqualified," the prisoners set forth absolutely no factual allegations suggesting incompetence, lack of necessary qualifications, or inadequate training on the part of any current or prospective member of Missouri's execution team. The prisoners' complaint makes no factual allegations suggesting any current or prospective member of Missouri's execution team would intentionally or unintentionally deviate from or ignore the written protocol. Nothing in the prisoners' complaint even remotely suggests any action or inaction by any member of Missouri's execution team poses a substantial risk of serious harm.

Instead, the prisoners' allegations stem entirely from Missouri's previous employment of Dr. Doe and, to a much lesser extent, Nurse Doe. Dr. Doe operated under an unwritten procedure, which Dr. Doe believed conferred upon him "independent authority to alter the chemical doses at will based on his medical judgment." Id. at 1075. It is undisputed that former unwritten protocol is no longer in effect and Dr. Doe no longer participates in executions in Missouri. Even accepting the prisoners' assertion Dr. Doe can be characterized as "incompetent" and "unqualified," Dr. Doe's past "incompetence" and lack of qualifications, while operating under the former unwritten protocol, does not support an inference any

aggravated stalking. The basis for the prisoners' contention is a newspaper article reporting a nurse on the execution team pleaded no contest to misdemeanor counts of stalking and tampering with property, arising from charges the nurse vandalized property and threatened a man who was having an affair with the nurse's estranged wife. The article also describes the nurse as having an "unblemished" nursing license. Because the prisoners' complaint does not include these allegations, we do not consider them on appeal. However, even if the prisoners had amended their complaint to include these allegations, we fail to see the relationship between the nurse's misdemeanor conviction and the nurse's competence to mix chemicals, check a prisoner for signs of consciousness, insert an IV, or monitor an IV site. See Harbison v. Little, 571 F.3d 531, 537 (6th Cir. 2009) (rejecting the district court's determination that a Tennessee execution team member's "history of drug and alcohol addiction and psychological disorders . . . raised questions about the screening process for members of the execution team").

member of Missouri's current execution team is "incompetent" or "unqualified." The mere allegation Missouri employed an "incompetent" and "unqualified" individual in the past simply does not support the prisoners' allegations Missouri will employ "incompetent" and "unqualified" personnel in the future.

Missouri's new protocol specifically requires a physician, nurse, or pharmacist to prepare the chemicals used at the execution, and requires a physician, nurse, or EMT to carry out the remaining medical aspects of the execution and supervise the non-medical members of the execution team. In Taylor, we emphasized "it is imperative for the State to employ personnel who are properly trained to competently carry out each medical step of the procedure." Taylor, 487 F.3d at 1084. In the absence of contrary supporting factual allegations, we will not assume or infer Missouri intends to disregard its own protocol, and this court's instructions, by employing medical personnel who are "incompetent" or "unqualified" to perform their assigned duties. The prisoners have not alleged a sufficiently substantial risk of serious harm or a sufficiently imminent danger to support an Eighth Amendment claim. We therefore conclude the district court did not err by determining, as a matter of law, the prisoners failed to state a claim for violation of the Eighth Amendment.

### C. Discovery

The prisoners argue the district court erroneously determined Baze limits the scope of discovery to which condemned prisoners are entitled, and precludes any consideration of the backgrounds or characteristics of individual members of Missouri's execution team as a matter of law. This is a misreading of the district court's order. The district court did not find that, under Baze, no facts could ever exist to warrant discovery into the background of a specific member of Missouri's execution team, or that consideration of a specific team member's background or characteristics is precluded in every case as a matter of law, nor do we read Baze so broadly. The district court simply determined judgment on the pleadings was appropriate in this case, and therefore the prisoners were not entitled to further

discovery. Because we affirm the district court's grant of judgment on the pleadings, we need not address the specific discovery rulings the district court made before granting judgment on the pleadings. See Casazza v. Kiser, 313 F.3d 414, 420 (8th Cir. 2002) (recognizing an appellate court need not reach discovery issues when affirming a district court's grant of a motion to dismiss).

The prisoners protest that, because the identities of the execution team members are kept secret, the prisoners are unable to uncover facts relating to the backgrounds and characteristics of individual execution personnel without first engaging in discovery. In their complaint, the prisoners assert they "are entitled by due process of law to receive information regarding the qualifications, training[,] and fitness of execution team members," and Missouri's "refusal to provide Plaintiffs with sufficient information bearing on the training and qualifications of the personnel . . . constitutes a violation of Plaintiffs' rights to due process of law." At oral argument the prisoners expressly abandoned this due process claim on appeal. Therefore, we need not decide whether the prisoners have a due process right to discover information relating to their executioners' backgrounds and qualifications.[9]

### D.    Motions to Intervene

The intervenors contend the district court erroneously denied their motions to intervene because (1) they are entitled to intervene in the action as of right, and (2) alternatively, they meet the requirements for permissive intervention. Because the district court properly granted judgment on the pleadings, we need not decide whether the intervenors should have been allowed to intervene if the underlying case had survived judgment on the pleadings. The district court did not err by denying the prisoners' motions to intervene because there is no longer an underlying case in which

---

[9]However, we have located no authority indicating the prisoners have such a due process right to probe into the backgrounds of execution personnel.

-13-

to intervene.  See Webster Groves Sch. Dist. v. Pulitzer Publ'g. Co., 898 F.2d 1371, 1377 (8th Cir. 1990) (finding no abuse of discretion in the district court's denial of a motion for permissive intervention where "the [plaintiff] already had taken a voluntary dismissal of its suit, and there remained no case in which to intervene"); see also Shempert v. Harwick Chem. Corp., 151 F.3d 793, 799 (8th Cir. 1998) (concluding the district court's denial of a motion to intervene was proper where the main action was dismissed).

## III.    CONCLUSION

We affirm the district court's grant of judgment on the pleadings and its denial of the motions to intervene.

_____