**Ralph D. RAY, Plaintiff–Respondent,**

v.

**The UPJOHN COMPANY, Defendant–Appellant.**

**No. 17820.**

Missouri Court of Appeals, Southern District, Division Two.

March 5, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 29, 1993.

Application to Transfer Denied May 25, 1993.

Kevin D. Meyers, Kansas City, Pat J. Merriman, Springfield, for plaintiff-respondent.

John W. Cowden, Phillip C. Rouse, Baker, Sterchi & Cowden, Kansas City, R. Lynn Myers, Springfield, for defendant-appellant.

PREWITT, Judge.

Plaintiff sought damages for injuries to his respiratory system caused by the inhalation of fumes from a chemical manufactured and sold by defendant. Following jury trial a verdict was received in favor of plaintiff for $1,500,000. Judgment was entered in accordance with the verdict. Defendant appeals, presenting twenty-two points relied on, three containing subparts

totaling an additional twenty-two contentions.[1]

Plaintiff started work at a manufacturing plant of Dayco Corporation (Dayco) in Springfield on April 7, 1962. Dayco uses chemicals, including PAPI, a chemical manufactured and sold by defendant, in manufacturing automotive fan belts. Plaintiff contends this chemical caused his respiratory condition of "isocyanate asthma".

Dayco purchased barrels of PAPI from defendant for use in its manufacturing process. PAPI is a polymeric isocyanate. Isocyanates come in several different chemical forms and are sold and used by many different companies for a variety of purposes. Isocyanates have been known for some time to cause respiratory problems.

In manufacturing their product, Dayco dips a synthetic cord in a mixture known as J–1019. Dayco workers make J–1019 by combining PAPI and toluene. PAPI does not react with toluene and toluene is not known to cause respiratory problems. After being dipped in J–1019, the cord is heated in an oven to over 150 degrees. The cord then goes to a second oven where it is heated to more than 300 degrees. Then the cord is dipped in another chemical known as R–F–L. The cord is again sent through two ovens where it is heated to about 460 degrees. In becoming a final product, the cord goes through other various finishing stages which are not relevant to the issues before this court.

The finished belts are in various forms. Some are incased in industrial rubber while others are "raw edged", meaning that the inside cord remains partly visible. To fill special orders some finished belts are again dipped in J–1019. The finished belts are stored awaiting shipment at either a warehouse at the plant or at Dayco's downtown warehouse.

When plaintiff began at Dayco the dip containing PAPI was not being used. Dayco began using PAPI in late 1962. Plaintiff was off work from August 1962 until May 1963. When plaintiff returned to work, Dayco was using PAPI and plaintiff worked in the area where the belts were dipped and heated. In July 1963, plaintiff began experiencing trouble breathing and was examined by his medical doctor. At the request of his doctor, plaintiff obtained a sample of J–1019 for examination purposes. After inhaling fumes from the J–1019, plaintiff experienced a respiratory reaction. The doctor requested that plaintiff be moved out of the area where he was then working.

From 1963 until 1979 plaintiff worked in various areas of the plant. Some positions were 300 to 400 feet from where the belts were heated and dipped, while others took him directly into that area. Plaintiff experienced some breathing difficulties from 1966 through 1973, however he did not seek medical attention for them. In 1977 plaintiff was instructed to dip finished belts in J–1019. After being exposed to J–1019 for approximately 10 minutes, plaintiff experienced breathing difficulties. Plaintiff stopped work and sought medical attention from the Dayco nurse.

Plaintiff experienced no breathing problems between 1977 and 1979. In September 1979, while a trim machine operator, plaintiff collapsed and was taken to the hospital. Plaintiff was off work until March 1980, when he returned to work in the warehouse at the plant. Plaintiff was then moved to the downtown warehouse. His breathing problems progressively worsened after being moved downtown, until he was forced to quit work.

Plaintiff was first seen by Hans Weill, a medical doctor, in 1983. Dr. Weill is experienced in the study of respiratory problems resulting from exposure to isocyanates. Dr. Weill diagnosed plaintiff as

---

**1.** It has been suggested that "[t]he mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases." *Jones v. Barnes,* 463 U.S. 745, 752, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987, 994 (1983) (quoting Jackson, *Advocacy Before the United States Supreme Court,* 25 Temp.L.Q. 115, 119 (1951)). Nevertheless, we attempt to give defendant full review of each contention preserved.

having isocyanate asthma. Plaintiff filed this action on September 10, 1984.

Expert testimony established that exposure to certain levels of isocyanates is tolerable for most people. Isocyanate exposure is dangerous at any level however to a person who is "sensitized" to isocyanates. Plaintiff contended at trial that he became "sensitized" when the experiment was conducted with the J–1019 by his doctor in 1963.

Plaintiff presented testimony at trial seeking to support his theory that isocyanates were present throughout the Dayco plant. Dr. Weill testified that plaintiff's prolonged exposure over the years to the isocyanate caused his disabling asthma. Other relevant facts are stated in discussing defendant's specific points on appeal.

Defendant's first point states that the court erred in not entering judgment in its favor "because plaintiff's claims are time barred as a matter of law under RSMO. Sections 516.120 and 516.100 in that this action was filed more than five years after plaintiff's causes of action accrued." The facts relevant to this point, although generally duplicating facts earlier stated, are briefly set forth in the next two paragraphs.

■ Plaintiff started at Dayco in 1962. Plaintiff first had problems breathing in 1963. His doctor concluded that "J–1019", a mixture of chemicals, used at Dayco, including PAPI, made by defendant, was the cause. Plaintiff changed his jobs in the plant. In 1977 plaintiff had breathing problems as he dipped finished automotive fan belts in J–1019.

On September 6, 1979, plaintiff collapsed at work and was taken to the hospital. The cause was believed to be J–1019. He was off work for six months and changed jobs to Dayco's downtown warehouse. He returned to work in March 1980 and his breathing condition became worse. Plaintiff sought medical attention and quit his job. In 1983 plaintiff saw a medical doctor in New Orleans, Hans Weill. Dr. Weill diagnosed plaintiff as having isocyanate asthma. This action was filed on September 10, 1984.

Under the relevant facts this court concludes that this issue is controlled by *Elmore v. Owens–Illinois, Inc.*, 673 S.W.2d 434, 436 (Mo. banc 1984). There, the court said:

Although Mr. Elmore knew as early as 1973 that he had shortness of breath, and knew also, from reading publications of his union, that long-term breathing of asbestos dust caused asbestosis, he did not know that his condition was asbestosis until it was diagnosed by his physician on May 13, 1976. It was not until such diagnosis was made that the character of the condition (asbestosis) and its cause (breathing asbestos dust) first "came together" for the plaintiff. Thus, plaintiffs' cause of action accrued on May 13, 1976, the date of the diagnosis made by his doctor at her office in Kansas City and was not barred by Missouri's five-year statute, the appropriate statute of limitations.

A recent case similar to this matter and *Elmore* is *Hogan v. Armstrong World Industries*, 840 S.W.2d 230, 234–235 (Mo.App. 1992). It follows *Elmore* in determining the statute of limitations did not start until the plaintiff was aware of his condition and its cause. Other cases examined which support the result reached here include *Linn Reorganized School Dist. v. Butler Mfg.*, 672 S.W.2d 340, 342–344 (Mo. banc 1984); *Krug v. Sterling Drug, Inc.*, 416 S.W.2d 143, 149–150 (Mo.1967); *Lockett v. Owens–Corning Fiberglas*, 808 S.W.2d 902, 906–908 (Mo.App.1991); *Kestner v. Missouri Pacific R. Co.*, 785 S.W.2d 646 (Mo.App.1990). Point I is denied.

The second and third points of defendant's also relate to the statute of limitations. Defendant contends in Point II that the trial court erred in not submitting this defense to the jury "because Missouri law requires that the defense of the statute of limitations be submitted to the jury if there is a material issue of fact." Point III asserts the trial judge incorrectly ruled on this issue.

■ Defendant is correct that when different conclusions may be drawn from the

evidence, the running of the statute of limitations is a jury question. *See Hopkins v. Goose Creek Land Co., Inc.*, 673 S.W.2d 465, 469 (Mo.App.1984). *See also Vogel v. A.G. Edwards & Sons, Inc.*, 801 S.W.2d 746, 756 (Mo.App.1990). In deciding Point I, it was determined that the date of diagnosis was the event that triggered the statute of limitations. Here, there is no dispute but that it was Dr. Weill who first diagnosed plaintiff as having isocyanate asthma in 1983. These facts were undisputed, and there are no material facts in dispute on this issue which would require it to be put to the jury. The trial judge ruled correctly. Points II and III are denied.

The next point we consider is defendant's fourth point. Defendant asserts that the trial court erred in not entering judgment in its favor because plaintiff "failed to make a submissible case on the element of causation, in that there was no evidence supporting Ray's theory that isocyanate fumes gassed-off finished automotive belts in the downtown warehouse."

■ George J. Heinz, M.D., testified that after plaintiff went to work at the downtown warehouse he believed plaintiff's breathing problems were "probably an isocyanate problem because that's the one that causes problems with very small amounts of chemical. Minute amounts will cause a problem in a patient's chest. Coupling that with the information I had that isocyanate was in the plant in '83 confirmed my suspicion that was what the problem was."

Dr. Heinz, when asked if the symptoms plaintiff had while he was working in the warehouse were "related to isocyanates?", replied:

"Well, in my opinion the minutest exposure to this chemical, even after the product has been already made and removed to a different place and still causing his symptoms, is a hallmark of isocyanate exposure. Yes."

David Hof, M.D. testified by deposition that the problems plaintiff had after starting work at the warehouse "were certainly compatible with the isocyanate inducing his hyperreactive airway problems." He further stated that levels of isocyanate "that

are essentially undetectable can continue to sensitize an airway that had been previously sensitized by higher levels of isocyanate."

A publication of defendant's, "Worker's Guide to Using Isocyanates and Polyurethanes Safely", states that persons who become "sensitized to isocyanates" can "have severe asthma-like attacks whenever they are re-exposed to even minute traces of isocyanate vapors."

This evidence was sufficient for the jury to believe that there were sufficient fumes coming off the finished automotive belts in the downtown warehouse to cause plaintiff's problems. Point IV is denied.

Points V, VI and VII claim error in the admission of evidence of "spills", "smoke" and "odors" at the Dayco plant. Defendant complains of this evidence because there was no showing that plaintiff was exposed to them or they produced "isocyanate fumes".

■ Evidence of chemical leaks, fumes, smoke and odors came in the first time it was presented without objection. There was also no objection to evidence of "overflows" which the parties sometimes refer to as "spills". The objection concerning the spills came only when the witness was asked to tell how the overflows or spills occurred.

Point VIII complains about testimony regarding "negative pressure" causing the circulation of smoke and fumes throughout the Dayco plant. The first witness who testified regarding "negative pressure" in the plant did so without objection.

For its tenth point, defendant contends that the trial court erred in allowing Joseph Sanders, a union safety representative, to testify about complaints received by him from workers at the Dayco plant. He testified without objections to "several complaints over the time about fumes and smoke in various areas of the plant." It was only when he was asked about the number of daily complaints that there was an objection.

■ None of these points were preserved for our review. Error is not considered by an appellate court unless it was presented to and decided by the trial court and where evidence is received without objection, complaints regarding its admission are not preserved for appellate review. *In re Marriage of Wardlaw*, 809 S.W.2d 470, 473 (Mo.App.1991); *C & M Developers, Inc. v. Berbiglia*, 585 S.W.2d 176, 187 (Mo.App. 1979). Points V, VI, VII, VIII and X are denied.

■ For its point IX, defendant contends the trial court erred "in admitting testimony concerning physical complaints by workers at Dayco other than Ray because the evidence was irrelevant and unsupported by expert testimony". Plaintiff's attorney stated at trial that this testimony "circumstantially proves the presence of the chemical" PAPI. Plaintiff asserts this aids his showing that chemicals were disbursed throughout the Dayco plant.

Two Dayco employees testified to their physical problems while working at Dayco. Neither witness testified, nor did other evidence indicate, that their condition was caused by PAPI. One witness testified that he experienced breathing problems in certain areas of the plant and the other testified that fumes in the same areas caused his throat to burn. As earlier noted, evidence of chemical leaks, smoke, fumes and odors came into evidence without objection. The testimony of these witnesses supports that these elements were present in certain areas of the plant.

Expert testimony was not necessary to establish that the conditions were caused by PAPI because the evidence was not offered to show this, but was relevant to substantiate the earlier evidence of fumes and smoke. It is obvious that fumes and smoke can cause physical problems and the conditions experienced by these witnesses were relevant to show the extent and density of the smoke and fumes. Point IX is denied.

Point XI states that the circuit court erred in allowing Dr. Hof to answer hypothetical questions "because the hypothetical questions omitted essential facts and contained assumptions which were not supported by the evidence". Appellant sets forth eight claimed errors in the hypothetical questions asked of Dr. Hof.

■ This court only reviews deficiencies in hypothetical questions to which a specific objection was made at trial. *Barr v. Vickers, Inc.*, 648 S.W.2d 577, 582 (Mo.App. 1983); *Skelton v. General Candy Co.*, 539 S.W.2d 605, 614 (Mo.App.1976).

■ Of those eight allegedly improperly assumed matters, only two were raised by objection when the hypotheticals were asked. The first was that there was no evidence indicating that plaintiff was exposed to isocyanate through the belts stored in the downtown warehouse. In discussing Point IV this court concluded that there was such evidence.

The remaining objection was "to the hypothetical making assumption the only thing he [plaintiff] was exposed to was isocyanate." The question asked Dr. Hof to "assume that Mr. Ray was exposed in the warehouse to belts that were previously treated with isocyanates, and also assume that there were no other sensitizing chemical that he was exposed to known today to cause occupational asthma."

■ Hypothetical questions must be based on facts and evidence or reasonable inferences from those facts. *Baker v. Gordon*, 759 S.W.2d 87, 94 (Mo.App.1988). Such questions "must fairly hypothesize the material facts reasonably relevant to, and justly present, the questioner's theory of the case so that an answer is of assistance to the trier of fact." *Barr*, 648 S.W.2d at 582.

In his brief plaintiff has three theories in response to defendant's contention, (1) that no specific objection was raised because the question was rephrased; (2) the warehouse opinion was given later without objection; and (3) "Dr. Weill said none of the other chemicals cause asthma."

■ The objection as quoted above was made and then plaintiff's counsel rephrased the question. In response to the rephrased question, defendant's counsel said, "[s]ame

objection, Your Honor." As we read the rephrased question it also hypothesized that the only thing plaintiff was exposed to that might cause occupational asthma was isocyanates. This was what defendant was objecting to and the objection was properly made.

■ That after answering the question the witness later testified that isocyanates caused the problem does not cure its earlier admissibility if it was properly objected to. Once a timely and sufficient objection is made, it is not necessary to follow it up with repeated objections to preserve the issue. *McJunkins v. Windham Power Lifts, Inc.*, 767 S.W.2d 95, 97 (Mo.App. 1989); *Chester v. Shockley*, 304 S.W.2d 831, 835 (Mo.1957).

■ Dr. Weill had earlier testified to numerous chemicals which he said would not have caused the condition from which plaintiff suffered. However, there was no evidence establishing that the chemicals Dr. Weill testified about were the only chemicals or the only things which plaintiff was exposed to at the warehouse which could have caused plaintiff's problems. Dr. Hof testified that plaintiff's problems at the warehouse although "compatible with isocyanate" could have been caused by other chemicals, dust or his smoking cigarettes.

The trial judge allowed Dr. Weill to testify about those chemicals, contemplating that plaintiff would prove those were the only chemicals plaintiff could have been exposed to while working at Dayco. Plaintiff apparently did not do so. We have not found and have not been cited to the record where it indicates that those chemicals were in the plant and were the only ones which plaintiff was exposed to in the plant and the warehouse.

There was no evidence to support the hypothetical asking the witness to assume "that there were no other sensitizing chemical that he [plaintiff] was exposed to known today to cause occupational asthma." It was erroneous to have allowed the question with that assumption.

■ It then remains for this court to determine if this was error "against the appellant materially affecting the merits of the action." Rule 84.13(b). Whether plaintiff's problems at the warehouse were caused by his exposure to isocyanate fumes coming from the automotive belts was a seriously contested issue. Although as earlier noted, while there was evidence for the jury to have so found, this does not mean that it was established that defendant's chemical was the only one present which may have caused plaintiff's problems.

Dr. Hof's testimony, however, added little, if anything, to the determination of this issue. He merely said that plaintiff's breathing problems while he was working at the warehouse were "compatible with isocyanate" but could have been caused by other things. He did not give the opinion that PAPI caused the problems. That plaintiff's problems "were compatible with isocyanate" was not disputed. The dispute was whether PAPI was a cause of his condition. Dr. Hof's answer to the hypothetical question could not have materially affected the determination of the disputed issue. Point XI is denied.

In Point XII defendant asserts that the court erred in allowing George Heinz, M.D. to respond to hypothetical questions because the questions "omitted essential facts and contained assumptions which were not supported by the evidence". Seven allegedly improper assumptions are stated. Point XIII makes identical assertions regarding hypothetical questions propounded to Dr. Weill.

■ Of the seven assumptions claimed to be erroneous, only three were raised when the doctors testified. Two relate to the belts at the warehouse emitting isocyanate fumes. In discussing Point IV, we concluded that such evidence existed. The remaining objection raised at trial is to the assumption that fumes from the "manufacturing process migrated throughout the entire plant." The testimony of smoke and fumes referred to earlier in deciding Points V, VI, VII, VIII, IX and X sufficiently indicated that J–1019 fumes circulated

throughout the plant. Tests performed at the request of Dayco on the air quality in the plant had confirmed this at least in part. Points XII and XIII are denied.

Defendant presents six points, numbers XIV, XV, XVI, XVII, XVIII, and XXI, asserting that plaintiff failed to make a submissible case. In the first four defendant says that plaintiff failed to prove causation.

In reviewing to determine if a submissible case was made, this court views the evidence most favorable to plaintiff, giving him the benefit of all reasonable inferences and disregards defendant's evidence unless it aids plaintiff. *Kircher v. Purina Mills, Inc.*, 775 S.W.2d 115, 116–117 (Mo. banc 1989). "Evidence of causation must be based on probative facts not on mere speculation or conjecture but plaintiff is not required to exclude all other possible causes or to prove an absolutely positive causal connection." *Id.* at 117. "A *prima facie* case of causation is made where the evidence is susceptible to a reasonable inference that injuries" to plaintiff resulted from defendant's product. *Id.*[2]

■ Plaintiff was required to show that defendant's product was a "substantial factor" in contributing to his injuries. *Elam*, 765 S.W.2d at 174. "Substantial" denotes that the defendant's conduct had such an effect that reasonable people would regard it as the cause of the harm. *Id.* *See also Hagen v. Celotex Corp.*, 816 S.W.2d 667, 670 (Mo. banc 1991).

■ Part of defendant's contention is that the testimony of the medical doctors "was insufficient to prove medical causation because their opinions were based upon facts which were unsupported by the evidence." As we determine there was no preserved error regarding hypothetical questions to Dr. Heinz and Dr. Weill, we conclude that based on their testimony, causation was established.

Other evidence confirmed the doctors' testimony. A "confidential" inter-house memorandum of Dayco, admitted in evidence, stated that samples were taken to determine "isocyanate ... levels in the plant associated with the use of PAPI." This study showed at least in certain areas of the plant the level of PAPI was above the "exposure limit" determined to be safe. Testimony of a former salesman of defendant showed that when heated to certain temperatures PAPI can emit vapors containing particles of the substance. Evidence showed that Dayco was heating PAPI to temperatures far exceeding that to which the salesman testified would result in vaporized fumes.

Contrary to defendant's contention, there was substantial evidence which showed defendant's product was used at Dayco during the operative period. It is not necessary that it was defendant's product to which plaintiff became "sensitized". The jury could find his condition resulted not from the "sensitization", but rather from the long term exposure to defendant's PAPI.

"The identity of the toxic substances to which harm is attributed ... may be shown by circumstantial evidence." *Elam*, 765 S.W.2d at 179. There was evidence that defendant's product was in the plant, fumes from it went throughout the plant and were present in the warehouse, those fumes could cause plaintiff's problems and at least two of the doctors thought that they did. Causation was sufficiently established.

Point XVIII states "that there was no evidence proving a non-warning defect in PAPI." Defendant asserts that plaintiff failed to make a submissible case supporting instructions patterned after MAI 25.04 and MAI 25.05 because he did not establish that PAPI was "unreasonably dangerous". Being "unreasonably dangerous" is a required finding of MAI 25.04 "Verdict Directing—Strict Liability—Product Defect" and MAI 25.05 "Verdict Directing—Strict Liability—Failure to Warn".

---

2. On causation in toxic chemical litigation, see the learned and extensive discussion in *Elam v. Alcolac, Inc.*, 765 S.W.2d 42 (Mo.App.1988), cert. denied 493 U.S. 817, 110 S.Ct. 69, 107 L.Ed.2d 36 (1989).

A product is actionable if it is dangerous "to an extent beyond that which would be contemplated by the ordinary consumer, who either purchases it or uses it, with the ordinary knowledge common to the community as to its characteristics." *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 376 (Mo. banc 1986). Plaintiff establishes that a product is defective upon proving that it was unreasonably dangerous as designed, he is not required to show that the manufacturer or designer is at fault. *Elmore*, 673 S.W.2d at 438.

In Missouri the jury decides the concept of unreasonable danger "by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties." *Nesselrode*, 707 S.W.2d at 378.

Plaintiff presented evidence that PAPI was designed to contain isocyanates; that isocyanates are the leading cause of occupational asthma; that isocyanate exposure can create permanent disability and irreversible pulmonary injury; and that 5% of the population exposed to isocyanates will acquire permanent asthma. Plaintiff sufficiently established that PAPI was unreasonably dangerous.

Point XXI asserts that plaintiff "failed to prove that the product reached him without substantial change in the condition in which it was sold." Plaintiff met this burden. It was, of course, mixed with other chemicals and heated, but there was evidence that PAPI would not "react" to those changes and would remain substantially of the same character. It was mixed as received and that use caused it to injure plaintiff. Points XIV, XV, XVI, XVII, XVIII and XXI are denied.

In its Point XIX defendant contends that one of the submission instructions was erroneous by failing to require a finding that plaintiff's damage was caused by a defect which existed when PAPI was sold by defendant. The instruction was patterned after MAI 25.04 and MAI 19.01.

It is clear from both the instruction and the evidence that if plaintiff was injured due to PAPI, it was caused by a defect which existed when the PAPI was sold. If erroneous, there was no way the instruction could have prejudiced defendant. If an instruction is erroneous, before reversing, this court must determine "its prejudicial effect". Rule 70.02(c).

Although objections to instructions at trial are not required to preserve error under Rule 70.03, failure to raise the specific issue can be considered in determining whether the instructional error is prejudicial. *Biermann v. Gus Shaffar Ford, Inc.*, 805 S.W.2d 314, 321 (Mo.App.1991). "If a defect is not readily apparent to counsel preparing to argue the case, it is unlikely the jury will be confused or misled." *Id.* Point XIX is denied.

Point XX asserts that the court erred in submitting Instruction No. 8, the damage instruction, "because the instruction improperly modified the term occurrence in MAI No. 4.01". The instruction given read:

If you find in favor of Plaintiff Ralph D. Ray then you must award Plaintiff such sum as you believe will fairly and justly compensate Plaintiff Ralph D. Ray for any damages you believe he sustained and is reasonably certain to sustain in the future as a direct result of his exposure to products containing isocyanates.

MAI 4.01 states:

If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe he sustained [and is reasonably certain to sustain in the future] as a direct result of the occurrence mentioned in the evidence.

The Notes on Use under MAI 4.01 indicate that in certain circumstances a substitution should be made for "occurrence" or there should be a modification with its use. Note 3 states in part:

When the evidence discloses a compensable event and a noncompensable event, both of which are claimed to have caused damage, the term "occurrence" may need to be modified. See *Vest v. City National Bank & Trust Company*, 470 S.W.2d 518 (Mo.1971). When the term "occurrence" is modified, substitute

some descriptive phrase which specifically describes the compensable event or conduct.

A change from "occurrence" appears to be required here. Cf. *Thweatt v. Haefner*, 539 S.W.2d 734, 735 (Mo.App.1976). Also we are not convinced any prejudicial effect is shown even if there was some error in the modification. No specific objection to the damage instruction on the ground now made was presented to the trial court before the instruction was given. As discussed in deciding the preceding point, this is relevant in determining the prejudicial effect of the instruction. Point XX is denied.

■ No authority is cited under Point Relied On XXII or in the argument portion of the brief under it. The absence of citation of relevant authority for points relied on, when such authority is available, justifies an appellate court to consider the point abandoned. *Black v. Cowan Const. Co.*, 738 S.W.2d 617, 619 (Mo.App.1987). As relevant authority would be available, Point XXII is deemed abandoned.

The judgment is affirmed.

MONTGOMERY, P.J., and FLANIGAN, J., concur.