

# In the
# Missouri Court of Appeals
## Western District

GEORGE W. GILES, )
)
                **Appellant,** )   WD77952
)
v. )   **OPINION FILED:**
)   **September 22, 2015**
CARMI FLAVOR AND FRAGRANCE )
COMPANY, INC., ET AL., )
)
               **Respondents.** )

**Appeal from the Circuit Court of Buchanan County, Missouri**
The Honorable Daniel F. Kellogg, Judge

Before Division Four: Alok Ahuja, Chief Judge, Presiding, Gary D. Witt, Judge and
John M. Torrence, Special Judge

Appellant George W. Giles ("Giles") appeals from the entry of summary judgment

in favor of his former employer, Respondent Ventura Foods,[1] as well as several entities

that Giles alleged designed, manufactured, and/or sold the product that caused his

medical condition while he was employed at Ventura Foods (collectively

---

[1] There is no contention that Giles's claims against Ventura Foods fall instead within the exclusive-remedy provisions of the Workers' Compensation Law. *See State ex rel. KCP&L Greater Mo. Operations Co. v. Cook*, 353 S.W.3d 14 (Mo. App. W.D. 2011).

"Respondents").[2]   Because a genuine issue of material fact remains as to when Giles's injury was capable of ascertainment, we reverse.

## Factual and Procedural History[3]

Giles worked at Respondent Ventura Foods's facility in St. Joseph from September 1, 1997 until May 30, 2003.  During the entire time that he worked as a maintenance worker and welder, Giles was exposed to diacetyl, which is a chemical that was used in butter flavoring.  Giles alleges that diacetyl is a strong irritant when inhaled.  Giles began to experience difficulty breathing, including shortness of breath, coughing, and wheezing, approximately two years after he began working at Ventura Foods.

In June 2001, Giles was referred by his primary care physician to board-certified pulmonologist Dr. Mark Yagan ("Dr. Yagan").  Giles saw Dr. Yagan several times in mid-to-late 2001 and on January 2, 2002.  At some point during treatment, Dr. Yagan learned that Giles welded equipment which processed butter flavoring and learned of a potential connection to the flavoring and lung disease.  Both Giles and Dr. Yagan saw at least one newspaper article about the possible connection between butter flavoring and certain lung diseases.  The information was reported in the newspaper after a cluster of bronchiolitis obliterans cases occurred at a microwave popcorn plant in Jasper, Missouri, where butter flavoring containing diacetyl were used.

---

[2] Giles alleged that butter flavor products and/or diacetyl used at Ventura Foods were designed, manufactured, and/or sold by Respondents Carmi Flavor and Fragrance Company, Inc., Centrome, Inc., Citrus & Allied Essences, Ltd., Danisco USA Inc., Firmenich, Incorporated, Flavurence Corporation, Givaudan Flavors Corporation, Givaudan Flavors and Fragrances, Inc., Henkel Corporation, Mother Murphy's Laboratories, Inc., Phoenix Aromas & Essential Oils Holdings, Inc., and Quest International, LLC.  We received three Respondents' briefs, and their arguments are addressed in this opinion collectively unless otherwise noted.

[3] "When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered."  *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

2

At an appointment on October 17, 2001, Dr. Yagan noted that Giles's presentation was *not* similar to the presentation of the workers in the Jasper plant who were diagnosed with the butter-flavoring caused lung disease. Sometime later that month, Dr. Yagan had a telephone conversation with Dr. Alan Parmet ("Dr. Parmet"), an occupational physician, about a different patient. As an aside, Dr. Yagan asked Dr. Parmet about Giles's case. Dr. Yagan wrote down the word "diacetyl" and noted there was a possibility of workplace exposure. As of at least October 31, 2001, Dr. Yagan believed that there may have been a possibility that Giles's lung condition could be related to his work. He noted in his medical records that he was concerned that Giles has an occupational-induced illness perhaps due to diacetyl. Specifically, Dr. Yagan wondered whether Giles was developing obstructive bronchiolitis obliterans or an interstitial lung disease.

Although the record is not clear as to the specifics, either Dr. Yagan or Giles sought a Material Safety Data Sheet ("MSDS") from Ventura Foods, and a copy was faxed to Dr. Yagan. The MSDS confirmed that diacetyl was present in Giles's workplace. The MSDS did not say the product would cause lung disease. Giles asked employees and representatives of Ventura Foods whether the same ingredients used in the microwave popcorn plant in Jasper that were causing workers lung disease were used at the Ventura Foods plant. Giles was assured by management that the amount of diacetyl used at the Ventura Foods plant was so small that it could not cause injury, particularly since he did not handle the product.

Dr. Yagan placed Giles on medical leave for four weeks to assess whether removal from the workplace would improve his symptoms. On October 30, 2001, Giles submitted

a request under the Family and Medical Leave Act stating that the doctor wants "to see if something at work is causing my lung to be irritated, and inflamed." Dr. Yagan also informed Giles's primary care physician that Giles's symptoms were potentially caused by workplace exposure to diacetyl.

Giles began showing improvement while he was away from work while taking less prednisone,[4] so Dr. Yagan initially thought that the variable that was different was not being at work. Dr. Yagan noted that the only way to prove that the butter flavoring was causing the condition was to taper Giles off of steroids and monitor him. If he "is doing okay then I will expose him to work again and *see if the cough comes back*" (emphasis added). But keeping Giles out of work did not make the condition go away, and in November of 2001, Dr. Yagan noted that this makes the occupationally induced disease "less likely." When asked whether it was his plan to "try to rule it out altogether," Dr. Yagan stated that "*if his cough wasn't getting better* I was going to keep pursuing all possibilities" (emphasis added). On January 2, 2002, Dr. Yagan performed a medical test (a methacholine challenge) which came back positive for asthma. That too made it less likely to Dr. Yagan that Giles had bronchiolitis obliterans, the lung disease caused by exposure to diacetyl. Additionally, Dr. Yagan ruled out interstitial lung disease. He communicated to Giles that his symptoms were caused by asthma which was flared up by sinusitis.

Also on January 2, 2002, Dr. Yagan cleared Giles to return to work. Dr. Yagan had not ruled out occupational exposure and believed further follow up was necessary for

_____

[4] Prednisone is steroid used to treat Giles's breathing symptoms.

a complete diagnosis, though he did not tell Giles this at the last appointment. Dr. Yagan testified, however, that if he had thought that there was "a serious consideration that Mr. Giles had occupational lung disease," then he would *not* have cleared him to return to work. Additionally, Dr. Yagan did not place any restrictions on Giles returning to work. Giles did not return to see Dr. Yagan because it seemed to him that prednisone was controlling his breathing problems (thus he saw "no sense to go back to him") and because he had no health insurance at the time.

On April 21, 2004, Giles saw his new primary care physician, Dr. Renee Claycamp ("Dr. Claycamp"), because he needed refills for his asthma medication. Dr. Claycamp referred Giles to a second pulmonologist, Dr. Nancy Brecheisen ("Dr. Brecheisen"), who examined Giles on November 30, 2005. Giles told this doctor that he had worked at Ventura Foods and related that he had been exposed to butter flavoring, which had been problematic for workers in a popcorn plant in southern Missouri. Although Dr. Brecheisen included Giles's concern in her treatment notes, after her examination, she was not able to diagnose Giles with anything other than asthma, a component of which was reversible, and dyspnea. Specifically, in her "ASSESSMENT" of Giles, she stated:

1. Mr. Giles is a 45-year-old male with asthma despite persistent use of steroids for the last four years. He still has a component of reversible disease present.
2. Dyspnea, likely secondary to incompletely treated asthma.
3. History of Wolf-Parkinson-White cardiac disease.

And in her "RECOMMENDATIONS" for Giles, she stated:

5

1. At this point, we will go ahead and repeat his allergen testing in hopes to find an allergen; an elevated lgE in attempts to document allergic component to his asthma which allowed immunomodulation with Xolair. I will follow up with him in two to three weeks after these labs are obtained.
2. He will call if problems occur in the interim.
3. If we can't get him off prednisone we might need to consider adding Methotrexate in as a steroid sparing agent.

The record includes no further medical history until November or December of 2011. At that time, Dr. Parmet examined Giles and diagnosed him with bronchiolitis obliterans, caused by the exposure to diacetyl contained in butter flavoring.[5] On January 4, 2012, Giles filed an action against Respondents based on flavoring-induced pulmonary disease. Giles voluntarily dismissed the action on July 18, 2013 but re-filed on December 3, 2013. Respondents brought motions for summary judgment based on the statute of limitations, which were sustained after a hearing. Giles appeals from the grant of summary judgment in favor of all Respondents as to all counts of Giles's petition.

Further facts are set forth below as necessary.

**Standard of Review**

Summary judgment shall be entered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 74.04(c)(6). The moving party bears the burden of establishing a right to judgment as a matter of law. *Id*. The statute of limitations is an affirmative defense under Rule 55.08, and respondents who move for summary judgment on that basis bear the burden of

---

[5] Giles was referred to Dr. Parmet by his current legal counsel.

showing that it bars a plaintiff's claims. *Powel v. Chaminade Coll. Preparatory, Inc.*, 197

S.W.3d 576, 580 (Mo. banc 2006).

> When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered. Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. We accord the non-movant the benefit of all reasonable inferences from the record.
>
> Our review is essentially *de novo*. The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment.

*ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo.

banc 1993) (citations omitted).

"An abundance of caution must be exercised in granting a motion for summary judgment because it is an extreme and drastic remedy that borders on the denial of due process because the opposing party is denied its day in court." *Jordan v. Peet*, 409 S.W.3d 553, 557 (Mo. App. W.D. 2013) (internal quotation marks and citation omitted). Thus, where the record does not support the granting of summary judgment, we will reverse. *Id*. Summary judgment should be denied where the affidavits or other sworn statements require an evaluative judgment between two rationally possible conclusions, even if the court is convinced the evidence makes it unlikely that a party can prevail at trial. *Reasons v. Union Pacific R.R. Co.*, 886 S.W.2d 104, 107 (Mo. App. E.D. 1994) (citation omitted).

**Analysis**

In his sole point on appeal, Giles argues that the trial court erred in entering summary judgment in favor of Respondents on the basis that Giles's claims were barred by the five-year statute of limitations because there is a genuine issue of fact whether Giles's claim accrued or was capable of ascertainment prior to his diagnosis of bronchiolitis obliterans in 2011.

The parties agree that the question is whether this action falls within the five-year limitation set out in Section 516.120. They dispute, however, whether the trial court erred in granting summary judgment pursuant to the language of Section 516.100, which states:

> Civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued; provided, that for the purposes of sections 516.100 to 516.370, the cause of action *shall not be deemed to accrue* when the wrong is done or the technical breach of contract or duty occurs, but when the *damage resulting therefrom is sustained and is capable of ascertainment*, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

(Emphases added.)

Because the action in this case was filed January 4, 2012,[6] the parties further agree that the operative date that determines whether Giles timely filed this action was January 4, 2007.[7] There is little question of when the exposure occurred. Giles worked

---

[6] The parties do not dispute that this case falls within the savings statute, Section 516.230, such that the filing of the original action (prior to dismissal) is the date measured for the statute of limitations.

[7] Respondent Ventura Foods contends that the statute of limitations began running in 2001, when Giles met with Dr. Yagan. Respondent Flavurence Corporation argues that the statute of limitations began running as early as

8

at Ventura Foods from 1999 until 2003, and it is conceded that diacetyl was present at the factory throughout his employment. The only issue, then, is whether the damages Giles sustained during his years of exposure to diacetyl at Ventura Foods were "capable of ascertainment" prior to 2007.

In *Powel*, our Supreme Court examined the term "capable of ascertainment" in this context. The Court began by noting that in the last amendment to Section 516.100, the legislature stated "in the plainest of words that the cause of action should no longer be deemed to accrue 'when the wrong is done or the technical breach of contract or duty occurs.'" 197 S.W.3d at 581 (quoting *Thorne v. Johnson*, 483 S.W.2d 658, 661-62 (Mo. App. K.C. 1972)). Instead, "the cause of action shall be deemed to accrue and all limitations shall commence to run only from the time 'when the damage resulting therefrom is sustained and is capable of ascertainment.'" *Id.* Stated another way, the *Powel* court held that

> the legislature specifically required in section 516.100 that a court *cannot* make the time the wrong is done or technical breach of duty occurs the time when the cause of action accrues. Neither does it accrue as soon as damages occur. A third event must also take place before the claim accrues: in addition to the wrongful act, and in addition to the resulting damages, the damages must also be *capable of ascertainment*.

197 S.W.3d at 582 (emphases in original).

Noting that its holding was consistent with forty years of jurisprudence, the *Powel* Court boiled down the test for when damages are capable of ascertainment and thus when the statute of limitations begins to run to when the "evidence was such to place a

---

2001 but no later than 2005. For reasons set forth below, we determine simply that there is a genuine issue of material fact as to whether Giles's injury was capable of ascertainment prior to January 4, 2007.

reasonably prudent person on notice of a potentially actionable injury." *Id.* at 582. "At that point, damages would be sustained and capable of ascertainment as an objective matter [or, in other words,] that is the moment when the damages would be 'substantially complete.'" *Id.* (citation omitted).

In determining whether the evidence in this case was such to place a reasonably prudent person on notice of a potentially actionable injury and thus the time when the damages would be substantially complete, we draw from several cases where courts have considered the "practical construction" of the term "capable of ascertainment" in similar situations. *Id.* at 583.

In *Elmore v. Owens-Illinois, Inc.*, the plaintiff brought a claim for injuries resulting from a prolonged exposure to asbestos dust manufactured by the defendant. 673 S.W.2d 434, 435 (Mo. banc 1984). The plaintiff had worked with asbestos from 1943 until he retired in 1976. Asbestosis is detectable from as early as 4 years to as long as 20 years after exposure, with the 15-20 year latency period being more common. *Id.* at 436. The plaintiff began to be short of breath, a symptom of asbestosis, in 1973; he was diagnosed with asbestosis in 1976. The court noted that although "Elmore knew as early as 1973 that he had shortness of breath, and knew also, from reading publications of his union, that long-term breathing of asbestos dust caused asbestosis, he did not know that his condition was asbestosis until it was diagnosed by his physician on May 13, 1976." *Id.* at 436. The court held

> It was not until such diagnosis was made that the character of the condition (asbestosis) and its cause (breathing asbestos dust) first 'came together' for the plaintiff. Thus, [the] cause of action accrued on May 13,

10

1976, the date of the diagnosis made by his doctor at her office in Kansas City and was not barred by Missouri's five-year statute.

*Id. See also Hogan v. Armstrong World Indus.*, 840 S.W.2d 230, 235 (Mo. App. W.D. 1992) (where plaintiff was not told of asbestosis after 1974 doctor visit and instead was diagnosed after the benefit of "hindsight" in 1985, the later date commenced the limitations period).

In *Ray v. Upjohn Co.*, the plaintiff sought damages for injuries to his respiratory system that were caused by inhalation of fumes from a chemical that he inhaled while working at an automotive fan manufacturing plant. 851 S.W.2d 646, 649 (Mo. App. S.D. 1993). The plaintiff claimed that exposure to chemicals used in the manufacturing process caused him to develop isocyanate asthma (from breathing a polymeric isocyanate). *Id.* at 649. In July 1963, the plaintiff began experiencing trouble breathing. At the request of his doctor, the plaintiff obtained a chemical sample for examination purposes. After inhaling the fumes, the plaintiff experienced a respiratory reaction. The doctor requested that the plaintiff be moved out of the area where he had been working. From 1963 until 1979, the plaintiff worked in various areas of the plant, sometimes in the area where the chemical was used. *Id.* He experienced some breathing difficulties from 1966 to 1973, but he did not seek medical attention. *Id.*

In 1977, the plaintiff was instructed to work directly with the chemical. *Id.* After being exposed to it for about 10 minutes, he experienced breathing difficulties and sought attention from his employer's nurse. The plaintiff experienced no breathing problems between 1977 and 1979. Then, in September 1979, he collapsed at work and the cause

11

was believed to be the chemical.[8]  The plaintiff was off work until March 1980.  His breathing problems progressively worsened in his new work location, and he was forced to resign.  In 1983, he saw a doctor experienced in the study of respiratory problems relating to iscocyanates exposure.  That doctor diagnosed isocynate asthma.  His petition was filed on September 10, 1984.  *Id.* at 650.

On appeal, the court held that the action in *Ray* was not barred by the statute of limitations because it did not begin to run until he was *aware of his condition and its cause*.  *Id.* (citing *Elmore*, 673 S.W.2d 434).  And as to whether there was a genuine issue of material fact, the court held that there was no dispute that the plaintiff was not diagnosed until 1983, which is when the statute of limitations began to run.  *Id.* at 650-51.

In *Reasons*, the Eastern District considered the statute of limitations in the context of an occupational hazard.  886 S.W.2d 104.  There, the plaintiff was a boilermaker with a long history of allergies, bronchitis, and sinus problems.  *Id.* at 106.  In 1976, he began working for a railroad and was continuously exposed to asbestos, odors from diesel engines, cleaning agents, chemicals, spray paint, dust particles, fumes, and black smoke created by welding around motor grease and other engine oils.  *Id.*  He believed that exposure to these products was merely triggering his allergies or that he was experiencing normal reactions to the irritants.  While at work, he suffered symptoms but "felt fine" as soon as he left his work place.  In 1979, an allergist informed plaintiff's employer that work conditions were irritating the plaintiff's sinuses and bronchial tubes and aggravating

---

[8] This event occurred slightly more than five years prior to the filing of the petition, so could not have been the triggering event to begin the running of the statute under that court's analysis.  *Id*. at 650.

12

his symptoms and recommended that the plaintiff wear a filtering apparatus or respirator. The plaintiff did not realize that the conditions were causing permanent damage to his lungs, sinuses, or respiratory system. *Id.*

In December 1986, the plaintiff was referred to a pulmonary expert, who diagnosed him with chronic bronchitis with a possible asthmatic component. *Id.* The expert noted that the plaintiff wondered whether there was a possible connection between his employment and his condition and they discussed the employee taking a new job, but the doctor believed the condition "probably [had] no specific cause" and prescribed medicine but allowed the plaintiff to continue work at the railroad. *Id.* at 106-07. The plaintiff began seeing another doctor in 1988, who diagnosed him with occupational asthma and who was the first physician to find a connection between the condition and the employment. *Id.* at 107. By 1991, the condition was advanced and the plaintiff was unable to work for an extended period of time. He filed suit on January 31, 1991. *Id.*

The *Reasons* action was brought under the Federal Employers' Liability Act. Similar to the *Powel* court's description of Section 516.100 -- that the action accrued when "evidence was such to place a reasonably prudent person on notice of a potentially actionable injury," 197 S.W.3d at 582 -- the statute of limitations under FELA was described as beginning when a claimant knows or has reason to know that he has been injured and knows or has reason to know the cause of his injury. *Reasons*, 886 S.W.2d at 109.

In determining that the statute of limitations did not bar the action, the *Reasons* court looked to case law including *Elmore* and *Ray* and held that precedent demonstrates

13

that "it is not enough to suspect a problem and a causal connection to start the statute of limitations ticking; one must either know of the problem and the probable connection or actively ignore a manifest problem which would be apparent to a reasonable person." *Id.* at 108. In so holding, the court "refuse[d] to abrogate a person's cause of action when it was unclear whether the employee was truly aware of the permanency of the problem." *Id.* at 109. "While there is no question employee knew his occupational conditions irritated him when he was at work, in order to find the statute of limitations has expired, we must find employee was aware he had sustained permanent damage that would not go away when he left his job site." *Id. See also Kestner v. Mo. Pac. R.R. Co.*, 785 S.W.2d 646 (Mo. App. E.D. 1990) (in examination of FELA statute of limitations, court recognized *Elmore* and held that trier of fact should decide when railroad employee knew or should have known that employment was the cause of his hearing loss).

In *Grady v. Amrep, Inc.*, the Eastern District was faced with another chemical exposure case. 139 S.W.3d 585 (Mo. App. E.D. 2004). There, the plaintiff leased space for a clothing store. *Id.* at 587. On June 3, 1989, she was exposed to Limo Sol, a turpentine-like chemical, which was being applied to a tile floor in a space adjacent to her store. *Id.* As a result of that exposure, she saw a doctor on June 9, 1989. On June 2, 1994, she filed suit for injuries caused by her exposure to the chemical, voluntarily dismissed that action, then re-filed on January 21, 1997. The plaintiff argued that her second action was within the five-year statute of limitations in part because she was not diagnosed with Chemical Sensitivities Syndrome until 1995. *Id.*

14

The *Grady* court began its analysis by noting that "damages are capable of being ascertained when a plaintiff having a recognized theory of recovery sustains compensable damages" and that "[d]amages are ascertained when the fact of damage appears rather than when the extent or amount of damage occurs." *Id*. at 588 (citations omitted). It analogized its facts to those where the fact of the damage and its cause were ascertainable at the moment of the injury. *Id.* (citing *Newton v. BPS Guard Servs., Inc.*, 833 S.W.2d 14, 16 (Mo. App. W.D. 1992) (statute of limitations barred action because it began running at the moment a man was shot, not when he later discovered he sustained permanent paralysis) and *Allison v. Mo. Power & Light Co.*, 59 S.W.2d 771, 773 (Mo. App. St.L. 1933) (statute of limitations barred action where man was struck by metal bar because even though extent of disability was not known, the damages pled were merely "aggravating circumstances enhancing the legal injury already inflicted")). The *Grady* plaintiff argued that her damages were not ascertainable until the time of her diagnosis in 1995, but the *Grady* court found *Elmore* and *Reasons* inapposite. The court noted that *Elmore* involved an occupational disease and that the trigger was the diagnosis because that was when the character of the condition first came together with its cause. *Id.* at 589 (citing *Elmore*, 673 S.W.2d at 436). The court distinguished *Reasons* on the grounds that there the plaintiff "felt fine" when not at work and only speculated that his work environment was triggering his reaction, whereas the *Grady* plaintiff "knew immediately that she was exposed to Limo Sol and that it caused her reactions." *Id*.

*Grady* is not the only case to hold that a cause of action can be capable of ascertainment prior to diagnosis. *See Johnson v. Norfolk & W. Ry. Co.*, 836 S.W.2d 83,

15

86 (Mo. App. E.D. 1992) (in examination of FELA statute of limitations, court rejected argument that statute does not begin to run until the injured party has actual knowledge of his injury and its cause; a plaintiff has an affirmative duty to investigate his injury and any suspect cause once he experiences symptoms); *Lockett v. Owens-Corning Fiberglas*, 808 S.W.2d 902, 908 (Mo. App. E.D. 1991) (statute of limitations began to run when asbestosis was diagnosed in 1979, even though another physician reviewed the records and determined that it was not correctly diagnosable until 1988).

Applying the reasoning from those cases to the facts at hand, we review the following facts, viewed in accordance with our standard of review, in the light most favorable to Giles:  Giles worked for Ventura Foods and was exposed to diacetyl from 1997 until 2003.  Two years into his job as a welder there, he began to experience shortness of breath, coughing, and wheezing.  He was referred to a board-certified pulmonologist, Dr. Yagan, in 2001.  Not long after he was referred to the pulmonologist, Giles and Dr. Yagan learned of a potential connection between diacetyl and interstitial lung disease or bronchiolitis obliterans, and that Giles was exposed to diacetyl.  Dr. Yagan ruled out interstitial lung disease, but he did not have evidence to diagnose bronchiolitis obliterans, and he determined that Giles's symptoms most likely were ***not*** due to occupational hazard.  Based on his examination and treatment of Giles, Dr. Yagan diagnosed asthma, a different lung disease than bronchiolitis obliterans.  It is true that Dr. Yagan testified that he was willing to consider looking further into the possibility that the symptoms were due to occupational hazard, but that statement was qualified by the condition that Giles's cough not abate.  Dr. Yagan cleared Giles to return to work because

16

he did not believe there was a connection between his symptoms and his work. Giles did not return to Dr. Yagan because his breathing got better and he saw no reason to return; in addition he had no health insurance. Some three or four years later, another pulmonologist, presented with the same possible connection between Giles's lung problems and an occupational hazard, examined Giles but diagnosed him with asthma. No doctor diagnosed Giles with bronchiolitis obliterans due to exposure to diacetyl prior to Dr. Parmet's 2011 diagnosis.

Although it may be the case that a reasonably prudent person in Giles's position would have been on notice of a potentially actionable injury prior to 2007, pursuant to the case law discussed above, this conclusion does not follow as a matter of law. Respondents have failed to put forth any evidence that in fact Giles's bronchiolitis obliterans was a diagnosable condition or capable of ascertainment at that time. The record indicates only that Giles wondered whether his symptoms were due to his exposure to diacetyl and that upon informing his physicians of the possible connection, neither of two specialists was able to diagnose him with a lung condition related to that exposure at least as of 2005. The first two specialists who treated Giles were unable to diagnose bronchiolitis obliterans even though they were made aware of the potential occupational hazard. Under these facts, we cannot find as a matter of law that Giles's cause of action accrued prior to 2007.

In so holding, we reject the argument that summary judgment should be affirmed because the medical community was aware of the potential that diacetyl exposure could cause lung disease in 2001 and thus that Giles was on notice of a potentially actionable

17

claim at that time. Respondents note that in the proceedings below, Giles provided several studies, journal articles, and other materials in support of his contention that exposure to diacetyl can cause injury. Respondents note too that some of those materials pre-date 2007 and some pre-date 2004.

In support of the argument that the medical community was aware of the connection and thus that Giles was on notice of a claim as of 2001 (or at least prior to January 4, 2007), Respondents rely heavily on *Ahearn v. Lafayette Pharmacal, Inc.*, a medical malpractice case. 729 S.W.2d 501 (Mo. App. E.D. 1987). There, the plaintiff experienced back problems because of a work-related accident and an automobile accident. The plaintiff underwent diagnostic procedures in which a dye was injected into her spinal canal on three occasions. *Id*. at 502. After two surgeries, she was diagnosed with arachnoiditis, which was caused by the dye. *Id.* at 503. However, the plaintiff was unaware of her diagnosis for several years, and there was testimony that she could not have known her diagnosis of arachnoiditis was from anything other than trauma until more than five years after she was diagnosed. *Id.* Noting that the "capable of ascertainment" standard is an objective test, the *Ahearn* court held that a plaintiff's ignorance of the cause of her disease (and thus her cause of action) did not prevent the running of the statute in part because the connection between arachnoiditis and the dye had been known for several decades. *Id. See also Buttice v. G.D. Searle & Co.*, 938 F.Supp. 561, 567 (E.D. Mo. 1996) (where plaintiff was diagnosed in 1981 and causal theory was capable of ascertainment at least by the mid-1980s, court held that action filed in 1994 was barred); *King v. Nashua Corp.*, 587 F.Supp. 417, 419 (E.C. Mo. 1984)

18

(where articles had alleged a correlation between products and "injuries such as plaintiff's" more than five years before action was filed, plaintiff's action was barred).

*Ahearn*, however, is not on point and does not aid Respondents. In *Ahearn*, the plaintiff was diagnosed with the condition which gave rise to a cause of action -- arachnoiditis -- more than five years before she filed her suit, and the connection between arachnoiditis and the dye had been known in the scientific community for several decades. In holding that the statute of limitations barred the action, the *Ahearn* court noted that the "test to determine when a cause of action has accrued is to ascertain the time when plaintiff could have first maintained the action to a successful result." 729 S.W.2d at 503. In the case at bar, based on the articles in the record, not only was the scientific community only beginning to piece together a connection between the bronchiolitis obliterans and diacetyl when Giles began showing symptoms of lung disease, two different pulmonologists examined Giles, and although each was made aware of a potential connection between the occupational exposure to diacetyl and Giles's lung problems, neither diagnosed Giles with bronchiolitis obliterans and neither connected his lung problems to his workplace. In 2002, Dr. Yagan cleared Giles to return to work because he did not believe there was a connection. And in 2005, another pulmonologist saw absolutely no connection. The record simply does not bear out, as a matter of law, that Giles could have maintained the action to a successful result prior to 2007, unlike in *Ahearn*, where the plaintiff's medical record contained a diagnosis and the

science had long provided a causal connection between the diagnosis and the alleged wrong.[9]

As noted above, the burden of establishing a right to judgment as a matter of law lies squarely with the Respondents. And, as the statute of limitations is an affirmative defense under Rule 55.08, Respondents bear the burden of showing that it bars Giles's claims. *Powel*, 197 S.W.3d at 580. Here, Respondents have not met their burden of showing that Giles's condition was capable of ascertainment prior to when it in fact was diagnosed in 2011. Instead, whether the cause of action was capable of ascertainment remains a factual issue. "[W]hen contradictory or different conclusions may be drawn from the evidence as to whether the statute of limitations has run, it is a question of fact for the jury to decide." *Powel*, 197 S.W.3d 585.

This point is granted.

## Conclusion

The judgment of the trial court is reversed and the cause remanded for further proceedings consistent with this opinion.

_____
Gary D. Witt, Judge

All concur

---

[9] The viability of *Ahearn* was called into question by *Miller v. Mobay Corp.*, 741 F.Supp. 177, 178 (W.D. Mo. 1990), where the judge was "deeply skeptical that *Ahearn* appropriately predicts where Missouri law is likely to find repose. . . . [because] I now conclude that medical community knowledge of possible causation is inconclusive" for accrual purposes.).

20